## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SJT DEVELOPMENT, INC., a Nevada Corporation, and SANDRA M. TRIANTAFILLOS, | ) ) ) ) | Case No. _____ |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| RACHEL L. RIEGER, a/k/a RACHEL ENSOR, DAVID L. RIEGER, DEANA M. GUHDE, DAVID F. GUHDE, MATTHEW WILSON d/b/a, JOE WILSON & COMPANY, ENDEAVOR DEVELOPMENT & INVESTMENT GROUP, INC., a Nevada Corporation, JOHN REYES, JEFFREY KINNICK, JAMES VEGA, JOHN DOES I-V, real names unknown, LEVEL ONE FINANCIAL, INC., a California Corporation, STAR CAPITAL CORPORATION, a Delaware Corporation, SILVER HILL FINANCIAL, LLC, a Delaware Limited Liability company, BAYVIEW LOAN SERVICING, LLC, a Delaware Limited Liability company, WACHOVIA BANK, NA, JOHN L. BERNARD, d/b/a BERNARD REAL ESTATE, IB PROPERTY HOLDINGS, LLC, a Delaware Limited Liability company, RANDY BENNETT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | NOTICE OF REMOVAL |
| Defendants. | ) | |

COMES NOW Defendant John L. Bernard d/b/a Bernard Real Estate ("Bernard"), by and through his attorneys, and hereby timely files this Notice of Removal pursuant to 28 U.S.C. §1331, 18 U.S.C. § 1961 et seq, and 28 U.S.C. §1441(a), (b) and (c), removing the above-captioned action to the United States District Court for the District of Nebraska, from the District Court of Nemaha County, Nebraska.  In support of this Notice, Bernard avers as follows:

NSJ/396018.1

1.      The above-captioned action was commenced by Plaintiffs in the District Court of Nemaha County, Nebraska, on or about November 16, 2010.  A true and correct copy of the Complaint (hereinafter "Complaint") and Summons is attached hereto as **Exhibit 1**.

2.      Service of the Summons and Complaint was made on Bernard on April 25, 2011.

3.      This action involves thirteen separate causes of action stemming from a real estate transaction in Nemaha County, Nebraska against the various defendants including claims for: breach of fiduciary duty, fraud by misrepresentation, two causes of action for fraud by concealment, negligent misrepresentation, tortuous interference, breach of management contract, civil conspiracy, and five causes of action for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

4.      The plaintiffs allege that some of the defendants worked together to sell her a sixteen unit apartment building in Auburn, Nemaha County, Nebraska that was overpriced and contained serious defects and code violations.  The plaintiffs allege that some of the defendants misrepresented the income from the property.

5.      The plaintiffs' claims for alleged violations of RICO are governed by 18 U.S.C. § 1961 et seq.

6.      A cause of action filed in state court seeking recovery under RICO is removable to federal court pursuant to 28 U.S.C. §1441 (c) as an action arising under a federal law.  *See Lichtenberger v. Prudential-Bache Securities, Inc.*, 737 F.Supp. 43 (S.D. Texas 1990).

7.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. § 1961 et seq.  As a civil action founded upon a claim of right arising under the laws of the United States, this action may be removed to this court pursuant to the provisions of 28 U.S.C. §1441(a), (b) and (c).

NSJ/396018.1

8.     This Notice of Removal is being filed within thirty (30) days of Bernard's receipt of the Complaint as required by 28 U.S.C. §1446(b).

9.     No pleadings, process or orders other than the Summons and Complaint have been served on Bernard and, therefore, no other pleadings, process or orders are attached to this Notice as would be required by 28 U.S.C. §1446(a).

10.     All fees required by law in connection with this notice have been filed by Bernard.

11.     The United States District Court for the District of Nebraska includes the federal judicial district in which Plaintiffs filed their Complaint.  Thus, removal is proper to this Court pursuant to 28 U.S.C. § 1441(a).

12.     In accordance with 28 U.S.C. § 1446(d), Bernard will serve a copy of this Notice of Removal and will promptly file a copy of this Notice of Removal in the District Court of Nebraska for Nemaha County.

13.     The following defendants are excluded from this Notice because more than six months have passed from the date the Complaint was filed on November 16, 2010, and pursuant to Neb. Rev. Stat. § 25-217 and *Reid v. Evans*, 273 Neb. 714, 733 N.W.2d 186 (2007) the action is dismissed without prejudice by operation of law as to any defendants named and not served with process within six months from the date the complaint was filed:

> ENDEAVOR DEVELOPMENT & INVESTMENT GROUP, INC., a Nevada Corporation; JOHN REYES; JEFFREY KINNICK; JAMES VEGA; JOHN DOES I-V, real names unknown; LEVEL ONE FINANCIAL, INC., a California Corporation; STAR CAPITAL CORPORATION, a Delaware Corporation; SILVER HILL FINANCIAL, LLC, a Delaware Limited Liability company; BAYVIEW LOAN SERVICING, LLC, a Delaware Limited Liability company; and WACHOVIA BANK, NA.

WHEREFORE, Defendant John L. Bernard d/b/a Bernard Real Estate, removes the above-captioned matter to the United States District Court for the District of Nebraska, from the District Court of Nemaha County, Nebraska.

**Defendant designates Omaha, Nebraska as the place of trial.**

DATED this 20th day of May, 2011.

<div style="margin-left:40%">

JOHN L. BERNARD d/b/a BERNARD REAL ESTATE, Defendant

By:  /s/ Aaron D. Weiner                    
    Nicole Seckman Jilek, #23682
    Aaron D. Weiner, #19148
    Abrahams Kaslow & Cassman LLP
    8712 West Dodge Road, Suite 300
    Omaha, Nebraska 68114-3419
    njilek@akclaw.com
    (402) 392-1250
    Attorneys for Defendant Bernard

</div>

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Defendant John L. Bernard d/b/a Bernard Real Estate, hereby certifies that on May 20, 2011, a true and correct copy of the Notice of Removal of Plaintiffs' Complaint was served by first class mail, postage prepaid, to the following:

Allan J. Eurek
Allan J. Eurek & Assoc., P.C.
3901 Normal Blvd., Suite 203
Lincoln, NE  68506-5205
Attorney for SJT Development, Inc. and
Sandra M. Triantafillos

| | |
|---|---|
| Rachel L. Rieger a/k/a Rachel Ensor | David L. Rieger |
| 62943 730 Road | 62943 730 Road |
| Johnson, NE  68378 | Johnson, NE  68378 |
| | |
| Deana M. Guhde | David F. Guhde |
| 1614 8th Ave. | 1614 8th Street |
| Nebraska City, NE  68410 | Nebraska City, NE 68410 |

I B Property Holdings, LLC
Registered Agent:  CT Corporation Systems
1024 K Street
Lincoln, NE 68508

Randy Bennett
703 13th Street
Auburn, NE  68305

Matthew Wilson d/b/a Joe Wilson & Company
2019 South 12th Street
Lincoln, NE  68502

 /s/ Aaron D. Weiner
Aaron D. Weiner

## IN THE DISTRICT COURT OF NEMAHA COUNTY, NEBRASKA

SJT DEVELOPMENT, INC., a Nevada
Corporation, and SANDRA M.
TRIANTAFILLOS,

        Plaintiffs,

    vs.

RACHEL L. RIEGER, a/k/a RACHEL
ENSOR, DAVID L. RIEGER, DEANA M.
GUHDE, DAVID F. GUHDE, MATTHEW
WILSON d/b/a, JOE WILSON &
COMPANY, ENDEAVOR DEVELOPMENT
& INVESTMENT GROUP, INC., a Nevada
Corporation, JOHN REYES, JEFFREY
KINNICK, JAMES VEGA, JOHN DOES I-V,
real names unknown, LEVEL ONE
FINANCIAL, INC., a California Corporation,
STAR CAPITAL CORPORATION, a
Delaware Corporation, SILVER HILL
FINANCIAL, LLC, a Delaware Limited
Liability Company, BAYVIEW LOAN
SERVICING, LLC, a Delaware Limited
Liability Company, WACHOVIA BANK,
NA, JOHN L. BERNARD, d/b/a BERNARD
REAL ESTATE, IB PROPERTY
HOLDINGS, LLC, a Delaware Limited
Liability Company, Randy Bennett,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

COMPLAINT

DISTRICT COURT OF
NEMAHA COUNTY, NE
FILED

NOV 16 2010

~~~~~~~~
DISTRICT CLERK

## JURISDICTION

1.    Subject matter jurisdiction is proper in the District Court of Nemaha County,
Nebraska, pursuant to Neb. Rev. Stat. §24-302 (Reissue 2008), as all causes of action stated
below are related to the acquisition by the Plaintiffs of real property located in Nemaha County,
Nebraska. Such real property is legally described as Lot 1, Block 4, First Addition to Calvert,
City of Auburn, Nemaha County, Nebraska, except that portion deeded to the City of Auburn,



000002854D44

EXHIBIT
1

commonly known 1301 19th St. Auburn, Nebraska (hereinafter "the Property"). The property is referred to locally as Avenue Apartments. The Property is a multi unit apartment building with 16 rental apartments in downtown Auburn, Nebraska.

2.  This Court's jurisdiction extends to the claims made herein under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, pursuant to the holding of the United States Supreme Court in Tafflin v. Levitt, 493 U.S. 455, 455, 110 S. Ct. 792, 792, 107 L. Ed. 2d 887 (1990).

3.  This Court has personal jurisdiction over each of the Defendants herein pursuant to Neb. Rev. Stat.§25-536 (Reissue 2008), because they are either residents of the State of Nebraska or because each has transacted business in this state, caused tortious injury to the Plaintiff in this state, contracted to supply services or things in this state, has an interest in using or possessing real property in this state, or has had such other contact with or relation to this state so as to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States, as more particularly described below.

## VENUE

4.  Venue is proper in the District Court of Nemaha County, Nebraska pursuant to Neb. Rev. Stat. §25-403.02 (Reissue 2008).

## THE PARTIES

5.  SJT Development, Inc. ("SJT"), is a Nevada Corporation, incorporated on August 28, 2006, with its principal place of business at 4535 W. Sahara Ave., Suite 200, Las Vegas, Nevada. SJT obtained a Certificate of Authority to transact business in the State of Nebraska, on April 30th, 2009, which certificate was revoked on April 16, 2010. SJT has had its Certificate of Authority reinstated pursuant to Neb. Rev. Stat. §21-20,180.01 (Reissue 2007). SJT filed for Bankruptcy in the United States Bankruptcy Court for the District of Nebraska, under Chapter 11 of the U.S. Bankruptcy Code, which filing was docketed as Case No. 09-43044. SJT set forth in its schedules of assets filed in said case, those claims which are asserted on its behalf herein, as contingency unliquidated claims. SJT converted its Chapter 11 case to one under Chapter 7 of the United States Bankruptcy Code, and urged the Chapter 7 Standing Trustee to pursue such

2

claims behalf of its creditors. On August 31, 2010, said standing trustee Joseph Badami, filed a
report of no distribution indicating that he had made a diligent inquiry into the financial affairs of
SJT and the location of the property belonging to the estate, and that in his opinion there was no
property available for distribution from the estate over and above that exempted by law, and
further certified that the Bankruptcy estate had been fully administered, and requested discharge
from any further duties as trustee. On September 2, 2010, the Bankruptcy Court entered an order
finding that the Bankruptcy estate had been fully administered, approving the report of the
Trustee and discharging him from further responsibility as trustee, and closing the Bankruptcy
case. By operation of Bankruptcy law, upon such closing, ownership of the said contingency
claims were transferred to SJT and/or Sandra M. Triantafillos, and SJT and/or Sandra M.
Triantafillos are entitled to pursue the same herein.

6.      At all times relevant, Sandra M. Triantafillos ("Sandra") was a resident of the
State of Connecticut, and the sole shareholder, director, and officer of SJT.

7.      At all times relevant the Defendants Rachel  Rieger and David L. Rieger,
(collectively herein "the Riegers"), were husband and wife, and were engaged in the business of
purchasing residential and commercial real property to generate rental income, and for profit
upon resale in Auburn, Nemaha County, Nebraska and surrounding communities.  On occasion
they did  business under the trade name of Rieger's Rentals. At all times relevant the Defendant
Randy Bennet was a resident of Nemaha, County, Nebraska and employed as an inspector for
compliance with fire codes and other ordinances on behalf of the City of Auburn.  Unless
otherwise indicated, individual Defendants herein are typically referred to by surname alone.

8.      At all times relevant, the Defendants Deana M.  Guhde and David F. Guhde
(collectively herein "the Guhdes"), were husband and wife, residents of Nemaha County,
Nebraska, and licensed as real estate agents under the laws of the State of Nebraska, and
employed by the Defendant John L. Bernard, also a resident of Nemaha County, Nebraska, who
is and was licensed as a  real estate Broker by the State of Nebraska, and  doing business under
the trade name Bernard Real Estate.  Prior to and after 2006, the Guhdes and the Riegers had
established both a personal and social relationship and a mutually financially beneficial business
relationship, whereby the Guhdes would assist the Riegers in locating and purchasing real
property for rent or resale for profit.  Upon deciding to sell a property the Riegers would list the

3

property with Bernard Real Estate and employ the Guhdes as their seller's agent to facilitate the sale.

9.      At all times relevant Matthew Wilson was a resident of Lancaster County, Nebraska, was an appraiser licensed by the State of Nebraska to perform appraisals of real property, and employed by or doing business as Joe Wilson & Company, a Nebraska real estate appraisal company.

10.     At all times relevant John Reyes, Jeffrey Kinnick, James Vega and John Does I-V, real names unknown, were residents of the State of California, and employees, officers, directors or shareholders of both the Defendant Endeavor Development & Investment Company, a Nevada Corporation, (Endeavor"), and the Defendant Level One Financial, Inc., a California Corporation ("Level One").

11.     At all times relevant, Star Capital Corporation ("Star Capital") was a Delaware corporation, authorized to do business in Nebraska as a mortgage broker, and was in the business of obtaining suitable financing from lending institutions to facilitate the acquisition of commercial properties by investors, nationwide.

12.     At all times relevant, Silver Hill Financial, LLC, ( "Silver Hill") was and is a Delaware limited liability company, and an affiliate of Bayview Financial Holdings LP, a Delaware Limited Partnership ("Bayview Holdings"). Silver Hill was engaged in aggressively seeking opportunities to finance acquisition of commercial real estate loans for packaging and marketing as mortgage backed securities through other affiliates of Bayview Holdings.

13.     At all times relevant, Bayview Loan Servicing, LLC, ("Bayview Servicing") was and is a Delaware Corporation, and also an affiliate of Bayview Holdings, and engaged in servicing of mortgage loans assigned to it by other affiliates, or other lenders, or contracting entities.   On occasion, the Company was engaged to ensure compliance with contractual obligations on behalf of indentured trustees obligated to protect recourse rights stemming from the sale of offerings of mortgage backed securities.

14.     At all times relevant Wachovia Bank, NA, ("Wachovia") was a National Bank and an indentured trustee of an offering of mortgage backed securities which included the loan to the Plaintiff herein, which loan was serviced by Bayview Servicing.

4

15.    At all times relevant, IB Property Holdings, LLC, was and is a Delaware Corporation, and an affiliate of Bayview Holdings, and was assigned to enforce available of remedies regarding loans in default which were assigned to or being serviced by other affiliates, including Bayview Servicing.

## GENERAL ALLEGATIONS

### A. The Fraudlent Scheme of Level One, Reyes, Kinnick, Vega, John Does I-V, Star Capital, and Wilson, Using a Separate Entity as Joint Adventurer ("the Reyes Group").

16.    In early 2006, Sandra Triantafillos ("Sandra"), began looking for an opportunity to invest in real estate. Because she lacked any significant prior experience in that type of investment, she attended a seminar purportedly designed to educate such potential investors, sponsored by the NRI (National Real Estate Investors Group), a Utah Corporation, in Salt Lake City, Utah, in the spring of 2006. At the seminar, Sandra met Defendant John Reyes, who was then a principal officer of Level One. Level One and Reyes undertook to establish a relationship with Sandra whereby they would assist her in locating investment opportunities, and determine the suitability of such opportunities to her investment goals. Sandra and John Reyes reached an understanding that if Sandra was willing to invest in a particular property, they would form a joint adventure with her, and use their specialized knowledge to assist her in acquiring a property, and then help her operate the property for their mutual profit.

17.    At the time Sandra first made contact with John Reyes and Level One, Level One was engaged in locating investment opportunities in commercial real estate nation wide by utilizing the Internet. Level One through Defendants Reyes, Kinnick, Vega and John Does I-V, sought commercial properties which were being offered for sale through that medium, which would be suitable to refer to prospective investors with whom they had developed a relationship. On occasion, Level One acquired an equitable interest in commercial property by purchasing it in advance, usually with a particular investor in mind, and then offering the opportunity for ownership to the investor as part of a joint adventure, representing that the property had

5

significant rental income to cash flow, and significant value growth potential to be flipped for another property in one or two years, generating a substantial profit.

18.      After initially contracting to obtain the property through one of their agents such as Kinnick, Level One communicated with the potential investor by U.S. Mail, email and facsimile transmissions via telephone lines regarding the merits of the potential investment. Level One's commitment to purchase through an agent such as Kinnick, gave the investor the impression that Level One had utilized the significant expertise of its officers and employees in evaluating the properties and that it was a good investment, and that if it were rejected by the targeted potential investor, Level One would either retain it for themselves or offer it to other potential investors they had a relationship with.  At this point misrepresentations of potential profits were communicated to the potential investor to hook them on the acquisition.

19.      In fact, Level One had done only a precursory investigation of the property at this stage, and Kinnick was utilized as the purchaser because he could trigger the contingency of being unable to get a loan to close the transaction.   When the investor appeared sufficiently through the fraudulent representations regarding viability and profits of the property, Level One, Reyes, Vega, Kinnick and John Does I-V, acted in concert to form a separate entity to become the joint venturer with the investor and advise the investor to form its own entity for the joint venture, so that should the investor make the decision to acquire the property from Level One, they would be in position to move quickly to close the transaction.

20.      The separate entity formed by Reyes and his co-conspirators was typically an under capitalized shell, and was utilized by Reyes and his co-conspirators to purportedly further evaluate the suitability of the property by arranging for an inspection of the property, historical rental income, potential income and value growth, and an appraisal, in order to obtain financing for acquisition of the property by the investor.  The investigation, inspection and appraisals, gave the impression of due diligence to the prospective investor, but instead were conducted and controlled by Reyes and the newly formed entity to minimize concerns, so as to provide a misleading and enticing opportunity, calculated to convince the potential investor to take action to purchase the property.  If the investor agreed to move forward, the purchase agreement would be assigned to the investor, releasing Level One from any further obligation to acquire the property or risk any capital regarding the property, but position Reyes and his co-conspirators to

6

profit from rents and resale. The new entity also assisted the investor in obtaining suitable financing using its continuing contacts with aggressive mortgage brokers such as Star Capital, whose brokerage fees were excessive compared to those otherwise available, and Star Capital contacts with aggressive commercial lenders such as Silver Hill Financial who were lax in underwriting because of the need for loan volume for mortgage security offerings. Accordingly the loan proposed was typically in very unattractive terms for the borrower compared to others available in the market place, and on information and belief there were kickbacks associated with placement of these loans to Star Capital, and to Level One.

21.    Once the decision to purchase was made, the purchase agreement was assigned to the investor, and the new entity formed by Reyes became a joint venturer with the investor and or the investor's newly formed entity. Under the terms of the joint venture agreement the two newly formed entities would share in the profits generated by the newly acquired property, but there was no discussion regarding losses. Under the joint venture agreement, the newly formed entity by Reyes was to be compensated by an exorbitant percentage of the rents and profits from the property, ostensibly as compensation for the previous efforts of Reyes, Kinnick, Vega and John Does I-V, on behalf of both Level One and the newly formed entity, both in assisting in the acquisition of the property and its operation after acquisition. The newly formed entity by Reyes was not required to make a capital contribution under the joint venture agreement and had no up front cash at risk despite laying claim of up to 40% of the profits.

## B.  The Fraudulent Scheme of the Riegers, the Guhdes, Bernard, and Bennett ("the Rieger Group").

22.    For a significant period prior to 2006, the Riegers were in the business of acquiring commercial rental property with the assistance of the Guhdes as aforesaid, for both rent and resale. The Riegers acquired properties in Cass, Otoe and Nemaha counties in Nebraska, and also counties in western Iowa. Though there are limited apartment complexes available for sale in this region, the Riegers, with the assistance of the Guhdes, have been involved in the acquisition and sale of at least three (3) apartment complexes and several other commercial properties in the region over the past ten (10) years. The Riegers, and in particular, Rachel

7

Rieger, managed the properties the Riegers acquired, entering leases, collecting the rents, and making improvements as required, and arranging for their resale. The Riegers utilized the professional real estate services of the Guhdes and their broker Bernard for most acquisitions and resales, but on occasion, they acquired properties at judicial foreclosure sales and non judicial foreclosure sales conducted by a Trustee under a Deed of Trust.

23.    On occasion, the Riegers and/or Rachel Rieger would carry back all or part of the purchase price on resale of a commercial property, and would occasionally become the owner of the property upon default by purchasing at a non-judicial foreclosure sale. Such re-acquisition allowed for a resale of the property. Overall, the Riegers were profiting from each sale through the down payments made by the purchasers, and the principal and interest payments on the carry back mortgages made prior to default.

24.    The Guhdes were profiting from real estate commissions on the sales and resales.

25.    Through a family friendship between Rachel Rieger and Randy Bennet, an employee of the City of Auburn responsible for local fire code inspections, Rachel Rieger became aware that many commercial properties in the region in which she operated did not meet fire codes promulgated by the Nebraska State Fire Marshall's office, but that these requirements were often overlooked by purchasers of commercial properties conducting due diligence for their purchase. She also learned that inspections by the State Fire Marshall's office were rare and usually conducted only after receipt of a reported violation by Bennett or a concerned citizen.

26.    Based on this information the Riegers and Guhdes concocted a scheme whereby the Riegers would acquire certain commercial properties at distressed foreclosure sales or otherwise, which they knew did not comply with fire codes applicable to the property, which was necessary for continued profitable operations. The Riegers would minimally improve the property after acquisition, without any effort to address fire code violations, and operate the properties for rental income, with the agreement by Bennet to allow the operations despite non-compliance with fire codes. The Riegers and the Guhdes would then offer the property for resale at a price which did not reflect such non-compliance with fire codes. .

27.    There were minimal commercial properties fitting this description in the region, so the Riegers, with the knowledge of the Guhdes, after some time following a sale had passed, would trigger a default by the purchaser by reporting them for fire code violations. Following an

8

inspection regarding the reported violations, the owners were required to cease or curtail operations until the code violations were corrected, often at great expense. The unexpected expense caused the owners to default on their loans, resulting in foreclosure sales where the Riegers could re-acquire the property so that it could be sold again by them at a profit by concealing the noncompliance with fire codes. The scheme was successful because of the friendship and tacit approval of Randy Bennett, who allowed the Riegers to operate the properties and collect rents despite their noncompliance with fire code requirements. This allowed the Riegers represent substantial earnings based on rents collected giving a misleading impression of the value of the property based on the rents collected. This allowed the Riegers and Guhdes to list these properties for far more than they were worth.

28.     With the advent of greater advertising on the Internet, and a high national demand for investment in commercial property, the Guhdes and Riegers realized that local prices for commercial real estate in Nemaha and Otoe Counties and the surrounding rural area would appear attractive to East and West Coast investors, at listing prices which would be considered exorbitant to local potential purchasers.

29.     Accordingly, the Riegers began listing commercial properties with the Guhdes on the Internet at prices which were five or six times beyond what they had paid for those properties and at least three times what they were worth. Included with these listings were commercial properties which required compliance with fire codes, a fact which was not disclosed by the Riegers or the Guhdes or Bernard.

30.     The Riegers and Guhdes, with the knowing participation of Bernard and Bennett, sought to deceive prospective purchasers with the Internet listings both regarding the value of the properties generally, and  their greatly reduced value based on non-compliance with the applicable fire codes.

31.     Using the Internet the Riegers and Guhdes could profit from their scheme to a far larger extent than they could by advertising a property locally, and duplicate those larger profits again and again by reporting fire code violations at an opportune time to allow reacquisition of the property.

32.     Whenever a question regarding value would come up, David Gudhe would tout his knowledge of local prices based on his work as a mortgage broker as well as a realtor to

9

convince a prospective purchaser. And alternatively to the allegations above, Wilson may have been a co-conspirator of the Rieger Group, instead of the Reyes Group, in providing an in accurate appraisal to facilitate financing.

### C. The Fraudulent Schemes Applied to the Plaintiffs.

33.     John Reyes and Level One developed a relationship with Sandra as a serious potential investor at the NRI Seminar as alleged above, and began to look for suitable properties for her to invest in as a joint adventurer with an entity to be formed by them. In the summer of 2006, Level One discovered the listing of Bernard Real Estate Company and Deanna Guhde for Avenue Apartments at 1301 19th St. in Auburn, Nebraska, with an asking price of $350,000 ("the Property" or "Avenue Apartments"). The Riegers had obtained the Property at a foreclosure sale for $47,000 in 2001, and had operated and managed it since then. At the time of the Internet listing, the Riegers, the Guhdes and Bernard knew that the Property was substantially over priced, and the Property was not even advertised locally.

34.     The Riegers, Bernard and the Guhdes also knew that Avenue Apartments were required to comply with fire codes by the installation of a sprinkler system but did not. Avenue Apartments had been previously owned by relatives of Rachel Rieger and she managed the property for them for several years, before it was sold to a third party. During that time, she was denied insurance coverage because of non-compliance with fire codes. When the third party subsequent Buyers defaulted, Rachel Rieger obtained the property at a Deed of Trust sale for $47,000.00 as aforesaid and had managed it for almost 5 years before listing it for sale in 2006 with the Guhdes and Bernard. Because of their familiarity with the property from previous ownership and/or management, and especially their knowledge of the difficulties in insuring the property because of its dilapidated condition and fire code discrepancies, Rachel and David Rieger knew the property was run down and in dilapidated condition and required extensive renovations to meet applicable fire codes. Riegers had not made substantial improvements to the Property themselves since 2001, and they knew its value was far less than even $100,000.00. They also knew through their family friendship with the Auburn fire chief, Randy Bennett, that the building did not have an adequate sprinkler system and other improvements necessary to pass

10

a State Fire Code inspection by the State Fire Marshal's office. Bernard and the Guhdes were also aware of this noncompliance. The Riegers continued to operate the properties and collect rents, and were not in inhibited in doing so through the acquiescence of Bennet. Their continuous operation allowed them to show a steady stream of income which both they and the Gudhes knew would be of significant interest to prospective purchasers, appraisers and potential lenders.

35.     The scheme of the Riegers, Guhdes and Bernard depended on the assumption that national investors not familiar with the local market would think the Property was listed at a good price, perhaps even a bargain price, without knowledge of the local market and concealment of the fire code violations.

36.     During the summer of 2006, Deanna Guhde was contacted by Jeffrey Kinnick representing Level One with regard to the Internet Listing. On information and belief, Kinnick advised the Riegers and the Guhdes that he worked for Level One and was considering purchasing the Property for an investor. Reyes informed Sandra about the Property and advised her to form a corporation which would be a joint venturer with an entity they were also forming if the property purchase was closed. Sandra formed SJT on August 31, 2006 with the assistance of a Nevada attorney recommended by Reyes.

37.     On or about September 7, 2006, Kinnick and the Riegers entered into a purchase agreement prepared by Deana Guhde for the purchase of Avenue Apartments for the sum of $350,000.00, the full asking price of the property. A true and accurate copy of the agreement is attached as **Exhibit A.** Kinnick was aware at the time he signed the agreement that he could easily avoid the contract by showing an inability to obtain financing.

38.     Endeavor was formed by Reyes and Vega on September 27, 2006, to become the joint adventure partner with SJT. Thereafter the Reyes Group worked together and in concert with the Gudhes and the Riegers to convince Sandra to invest in the property. Endeavor arranged for a superficial inspection of the property, which disclosed some defects, but Endeavor did not require an inspection of fire code compliance typically required as due diligence for the acquisition of commercial property renting multi-family units. Reyes and Endeavor provided Sandra with an inspection report, but the report was sanitized so as not to disclose the inspector, or date of inspection. Reyes and Endeavor required disclosure of rental income, but they did not

11

verify rental income, nor did they inquire if the property was over priced using county ad valorem
assessment records. They attempted to obtain an appraisal of the property but when local
appraisers refused to consider a value anywhere near the price stated in the purchase agreement,
David Guhde rendered an opinion to Sandra that based on his experience as both a mortgage
lender and realtor, he could vouch that the property was not overpriced. Matthew Wilson was
brought in by Endeavor, or Guhde to appraise the property for Endeavor based upon almost
irrelevant Omaha apartment building comparables of rental income, and he determined the
Property had a value of $340,000. Wilson, Guhdes, Rieges, Bernard and at this point, Reyes and
Endeavor, knew this was a gross overstatement of the value of the property even without
consideration of whether it complied with applicable fire codes. Wilson did not consider
whether the property complied with such codes during his inspection. His appraisal was
immediately mailed to Sandra by Endeavor, as Wilson knew it would be. A true and accurate
copy of the appraisal is attached as **Exhibit B**. Level One purported to do due diligence for the
acquisition, while at the same time attempting to entice Sandra to take over the investment
through an assignment of the purchase agreement. Reyes, Level One and Endeavor, either
intentionally or negligently failed to require a fire code inspection or to inquire about whether the
property complied with applicable fire codes. Alternatively, they were already aware of the non-
compliance through information provided by Rachel Rieger, Bernard, and/or Guhdes and
concealed it. The property was then in a dilapidated condition, but the physical condition of the
property was not accurately reported to Sandra via an inspection report prepared for Endeavor.
The inspection was not complete and thorough, though it listed some discrepancies to appear
legitimate. The sections provided to Sandra did not disclose any inspection for compliance with
fire codes. The identification of the property inspector was not disclosed to Sandra, so that she
could ask further questions.

    39.    Reyes continued making representations regarding the viability of the property
representing that it could be sold in a couple of years for over $900,000. Endeavor utilized its
connections with Star Capital and Silver Hill Financial to obtain preliminary interest in a loan
based on Wilson's appraisal. Reyes, Endeavor and Star Capital knew that Silver Hill would not
scrutinize the loan according to typical underwriting practices, based on past experience and that
it was likely to be approved.

12

40. Based on the representation of David Guhde regarding value, the appraisal submitted to Sandra prepared by Matthew Wilson, and the continuous representations to Sandra by Reyes of obscene profits upon resale after a year or two of holding the property, Sandra agreed to invest in the property and the purchase agreement was assigned to her on November 17, 2006 by both Kinnick and Rieger, as shown by the Addendum which is part of **Exhibit A**.

41. Fulfillment of the contingency of approved financing remained a critical concern despite the assignment to Sandra, and Reyes on behalf of himself and Endeavor further exploited his contacts with Star Capital and Star Capital in turn utilized its contacts with Silver Hill to obtain approval for a loan for Sandra. Despite significant relaxation in underwriting requirements, including waiver of a separate appraisal and acceptance of Wilson's appraisal, Silver Hill approved a loan for only $255,000, even with a personal guaranty by Sandra.

42. The maximum cash contribution that Sandra could make toward purchase and closing costs without Endeavor's assistance was $34,000.00, and accordingly, through Endeavor's efforts, the purchase agreement was amended with the Riegers reducing the purchase price to $340,000, and further agreeing to a $51,000 carry back promissory note secured by a second mortgage. The amendment is also part of **Exhibit A**.

43. With these modifications financing was approved with Silver Hill Financial as Lender. With the financing contingency in the purchase agreement fulfilled, a closing date was set.

44. In anticipation of closing, Endeavor and Plaitniffs agreed to a joint venture agreement which would provide Endeavor with 40 % of the rental income from the Property and 40 % of the profits on resale. Endeavor recommended that Sandra contract with the Riegers to manage the property locally, and account for rents and expenses to Endeavor. A management agreement between Sandra and the Riegers was prepared. A true and accurate copy is attached as **Exhibit C**.

45. Closing was held on January 4, 2007 with a payment in cash for down payment and closing costs made by SJT with funds provided by Sandra as a loan / or capital contribution to SJT in the amount of $39,000.00. SJT executed a promissory note in favor of Silver Hill Financial in the amount of $255,000, secured by a first deed of trust. The balance of the purchase price was paid with through a promissory note back to The Riegers secured by a Second

13

Deed of Trust. The Joint Venture agreement and property management agreement described above were executed.

46.   After Plaintiff entered into a management agreement with the Riegers to manage the property and account to Endeavor, Endeavor opened a local checking account for deposit of rental income and gave the Riegers signing authority for checks to pay for improvements, management fees, maintenance expenses and monthly mortgage payments, including their own. Any balance remaining was to be transmitted to Endeavor who would then account to SJT.

47.   Endeavor made some sporadic payments to the Plaintiffs but there has never been an accounting by either the Riegers or Endeavor to this date of either income or expenses from the property for the period extending from January 4, 2007 through March 30, 2009.

48.   In 2008, Endeavor, at the insistence of the Plaintiffs, began to make preparations for resale of the property, and Endeavor contacted Deana Guhde to list the property, but she was not eager to do so.  Deanna Gudhe then made the Riegers aware of these efforts and shortly thereafter Rachel Rieger reported to the State Fire Marshall's office that the property did not comply with fire codes.  An inspection was conducted on October 21, 2008, resulting in an administrative order dated October 23, 2008, restricting operation of the property and prohibiting new rentals until the property was brought into compliance. A copy of the order is attached as **Exhibit D**. Rental income dwindled because of the order and soon was insufficient to make mortgage payments. The order precipitated and investigation by the Plaintiffs which led to the discovery that they had been defrauded as set forth herein.

49.   On March 30, 2009, Plaintiff after consulting with Reyes, Plaintiffs terminated the management contract of the Riegers and Sandra began to manage the property herself subject to the Fire Marshall's order.

50.   Plaintiffs defaulted on their purchase money loan which had been assigned by Silver Hill to Bayview Loan Servicing, LLC, and also on their carry back loan with the Riegers. Plaintiffs attempted a modification of the Loan with Bayview Servicing, and became aware that a local Auburn person, believed to be Rieger, indicated to the Company that she was interested in purchasing the property following the Deed of Trust Sale. Bayview Servicing assigned the Loan and Deed of Trust to IB Property Holdings for foreclosure, and IB Property Holdings subsequently conducted a Deed of Trust Sale at which Avenue Apartments were purchased by

14

said company for the amount of $100.00. Silver Hill, Bayview Servicing, IB Property Holdings, and Wachovia Bank NA may be necessary interested parties to this action, because of the deficiency due and owing under the loan documents including Sandra's guaranty to one or more of them, and accordingly, they have been named as Defendants herein.

51.     The outstanding balance of the loan at the time of sale was not less than $253,000.00. Sandra has lost her entire personal investment of $34,000, closing costs of approximately $5,000.00, and is potentially liable to IB Property Holdings or another entity identified in the previous paragraph under a guaranty of the loan in the amount of the unpaid balance.  Endeavor disclaims any responsibility for this indebtedness. The Riegers have claimed that the Plaintiffs are indebted to them for over $53,000 on the carry back promissory note, secured by a second Deed of Trust.

## FIRST CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

Comes now the Plaintiffs and for their first cause of Action against the Defendants Reyes, Kinnick, Vega, John Does I -V, Level One and Endeavor, and incorporate the allegations of Paragraphs 1 through 51 above, and further state as follows:

52.     The aforesaid Defendants against whom this cause is alleged entered into a relationship with the Plaintiff following the seminar at which John Reyes made contact with Sandra during the spring of 2006 whereby they became confidential investment advisers to her regarding real estate investment. Endeavor entered into the same relationship after it was formed.

53.     The relationship with Sandra was in the nature of a partnership whereby said Defendants would contribute their expertise by locating real property for investment, which Sandra or an entity formed by her would purchase. Upon purchase, the Defendants would assist in managing the property and they would share in the rents and profits based on their contributions to the venture.

54.     The said Defendants owed a duty to Sandra and upon its formation, to SJT, of the utmost good faith and fair dealing in all matters relating to the venture as a fiduciary to them.

15

55.    The said Defendants except Endeavor through concerted effort, located the Property listed by the Guhdes through the Bernard Agency. All said Defendants in this cause then represented its viability as an investment, and assisted Sandra and SJT in acquiring the Property and then later managing it as aforesaid. In doing so, they breached their fiduciary duties to the Plaintiff's in the following respects:

> a.    They did not perform due diligence to accurately ascertain the true value of the property.
>
> b.    They did not require a competent inspection of the property to determine its dilapidated condition, or did determine its dilapidated condition and withheld that information from the Plaintiffs.
>
> c.    They did not perform due diligence to ascertain whether the property was in compliance with building codes and fire codes.
>
> d.    They failed to obtain adequate rent rolls and determine the true income producing potential of the property.
>
> e.    They knowingly or recklessly misrepresented the profit that could be obtained upon resale of the property in a couple of years.
>
> f.    They conspired with Wilson, to obtain an appraisal of the Property far beyond what they knew the property was worth and used the appraisal to convince Sandra and SJT of the value of the property as appraised.
>
> g.    They obtained financing from through source s that charged greater fees and interest than could be obtained elsewhere, and from a Lender that they knew would not impose typical underwriting standards prevalent in the industry but instead would be more lenient in approving the loan without a thorough investigation of the value of the Property.
>
> h.    They proposed and entered into a written joint venture agreement with Plaintiffs which was unconscionable because it provided for their   .  compensation from the rents and profits of the Property acquired which were far in excess and beyond the fair value of the services rendered, to the detriment of Sandra and SJT.
>
> i.    They failed to provide proper management to the venture, and instead

16

                         abdicated that responsibility to the former owners and then failed to
                         provide oversight of their management.

                  j.     They failed to properly account to the Plaintiffs for the rents and profits of
                         the venture, and the expenses of the venture, or to provide the Plaintiff SJT
                         with its fair share of rents and profits from closing on January 4, 2007
                         until the Plaintiff assumed management of the Property in April of 2009.

     56.     The Plaintiffs did not discover the breaches of fiduciary duty, and due to
concealment by said Defendants, with reasonable diligence could not have discovered said
breaches until the spring of 2009.

     57.     The aforesaid breaches of fiduciary duty also constitute breaches of the joint
adventure agreement between the parties.

     58.     Because of the aforesaid said breaches set forth in Paragraph 51 a- f, the Plaintiff
accepted assignment of the purchase agreement and provided the capital to close the purchase
with funds provided by Sandra, through a loan to SJT by Silver Hill, guaranteed by Sandra,
and through a loan by the Riegers to SJT  Both loans , both of which were secured by the
Property.

     59.     The Plaintiffs have been damaged in the amount of the purchase price as title to
the Property has been lost through non-judicial foreclosure, in the amount of $340,000.00 , plus
closing costs of $5,000.00, and the cost and expense of the Chapter 11 and Chapter 7
Bankruptcies of SJT.

     60.     The Plaintiff has been damaged by the aforesaid breaches set forth in Paragraph 51
g through j, in an as yet undetermined amount, and because the rents, profits and expenses from
operating the property after closing involve a complicated system of accounts with the Riegers
as unsupervised managers, accounting to Endeavor, with only minimal information being
provided to the Plaintiffs.  Accordingly, an accounting is required to ascertain the damages due
to the Plaintiffs as a result of said breaches.

     Wherefore the Plaintiffs pray for Judgment against each Defendant against whom this
cause of action is alleged, jointly and severally in the amounts set forth in Paragraph 55; for an
accounting of rents and profits from January 4, 2006 to  March 30, 2009, to determine whether
or additional amounts are due and owing and if so to include said amounts in the judgment

17

entered.; for the cost and expense incurred in the Bankruptcies of SJT; for the costs of this action, and for such other relief as may be just and equitable.

## SECOND CAUSE OF ACTION
### FRAUD BY MISREPRESENTATION

Comes now the Plaintiffs and for their Second Cause of Action against the  Defendants Reyes, Kinnick, Vega, John Does I -V,  Level One,  Endeavor,  Star Capital,  and Wilson, and reallege the allegations contained in Paragraphs 1 through 60 above, and further allege and state as follows.

61.    Said Defendants, or some of them  participated in making  representations to  the Plaintiffs before Plaintiffs  agreed to accept assignment of the purchase agreement between Level One and the Riegers,  that:

a,    the property was a bargain, and could be flipped rapidly with resulting profits of up to $700,000 in just a couple of years.

b.    That the property had been properly inspected in accordance with due diligence procedures and that it was in good condition, and in operable condition in compliance with applicable codes and ordinances.

c.    That the appraisal obtained on the property was an accurate indicator of the value of the property.

62.    Said statements were false or were know by he Defendants to be false or else were recklessly made with the intention that the Plaintiff rely upon them.

63,    The Plaintiffs did rely upon them by taking an assignment of the purchase agreement and later closing the purchase by paying or becoming obligated to pay the purchase price of $340,000 and closing costs of $5,000.00.

Wherefore the Plaintiffs pray for Judgment against each Defendant against whom this cause of action is alleged, jointly and severally in the amount of $345,000, and for the costs of this action.

## THIRD  CAUSE OF ACTION
### FRAUD BY CONCEALMENT

Comes now the Plaintiffs and for their Second Cause of Action against the  Defendants

18

Defendants Reyes, Kinnick, Vega, John Does I-V, Level One, Endeavor, Star Capital, and Wilson, and reallege the allegations contained in Paragraphs 1 through 63 above, and further allege and state as follows.

64.    That during the course of investigating the property as a potential investment, the Defendants became aware that the asking price for the property was grossly in excess of its true value, and that the property failed to comply with fire code regulations applicable to the property which further devalued it.

65.    These facts were material to the decisions of the Plaintiffs to invest in the property by taking an assignment of the purchase agreement between Level One and the Riegers, and closing the purchase.

66.    That these Defendants knew that the Plaintiffs were relying on them to investigate and disclose any defects or concerns about the property and was not undertaking an investigation of their own to do so.    Accordingly, these material facts did not become known to Plaintiffs and would not have become known to them through reasonable observations.

67.    The Plaintiffs were reasonably misled regarding the true condition of the property, and that the concealments participated in by the Defendants, were the proximate cause of the Plaintiff's taking an assignment of the purchase agreement and later closing the purchase by paying or becoming obligated to pay the purchase price of $340,000, and closing costs of   . $5,000.00.    Therefore the Plaintiffs have been damaged in that amount.

Wherefore the Plaintiffs pray for Judgment against each Defendant against whom this cause of action is alleged, jointly and severally in the amount of $345,000, and for the costs of this action.

## FOURTH CAUSE OF ACTION
## FRAUD BY CONCEALMENT

Comes now the Plaintiffs and for their Fourth Cause of Action against the Defendants Bernard, the Guhdes, the Riegers, Bennett, Wilson, and reallege the allegations contained in Paragraphs 1 through 67 above, and further allege and state as follows.

19

68. The Defendant John Bernard of Bernard Real Estate Company was the supervising broker of the Guhdes, who were both acting in the scope and course of their employment as real estate agents and also outside of the scope of such employment to participate with the Riegers in perpetrating a fraud.   John Bernard and  Bernard Real Estate Company is vicariously liable for the breach of any duty owed by the Guhdes to the Plaintiffs which are imposed by them imposed by them by virtue of Neb. Rev. Stat. Sect. 76-2401 through 76-2430, when acting within the scope of their duties as real estate agents.

69.    At some point during the spring of 2006, the Riegers listed the property for sale with the Guhdes and Bernard for the price of $350,000,  and Deana Guhde , a licensed real estate agent, became the seller's limited agent, as such term is defined in Neb. Rev. Stat. §76-2414.

70.    At the time the listing agreement was entered into,  or at least prior to September of 2006, both the Riegers and the Guhdes, and Bernard were aware that the asking price for the property was grossly in excess of its true value, and that the property failed to comply with fire code regulations applicable to the property which further devalued it and potentially precluded  a purchaser's ability to obtain rents from the property until the code violations were corrected at substantial expense.

71.    These facts were adverse  material facts relating  to the decisions of Level One to purchase the Property and to the Plaintiffs decision to invest in the property by taking an assignment of the purchase agreement between Level One and the Riegers, and closing the purchase. The Riegers as Sellers, and the Guhde's as the Seller's limited agent, and Bernard as broker, had a duty to disclose to both Level One and the Plaintiffs all adverse material facts about the aforesaid property known by them, including the adverse material facts set forth in this cause.

72.    That these Defendants suppressed these material facts and concealed them with the intent to mislead Level One and the Plaintiffs as to the true condition of the property.

73.    That Level One was reasonably misled by the concealment of these material facts by entering into an agreement to purchase, and the Plaintiffs were reasonably misled the concealment of these material facts when they decided to take an assignment of the purchase agreement from Level One and close the purchase, which they would not have done if they were aware of such material facts.

20

74.     These material facts did not become known to either Level One or the Plaintiffs, and would not have become known to them through reasonable observations.

75.     The concealment of these material facts were the proximate cause of the Plaintiff's taking an assignment of the purchase agreement and later closing the purchase by paying or becoming obligated to pay the purchase price of $340,000, and closing costs of $5,000.00.    Since IB Property Holdings is the current owner of the Property, and the Property has not yet been sold to a bona fide purchaser for value without notice,  Plaintiffs are still entitled to the equitable remedy of rescission of the purchase agreement, cancellation of Warranty Deed and return of the purchase price of the property.

WHEREFORE, the Plaintiffs pray that the purchase agreement with the Riegers be rescinded and the Warranty Deed from them to SJT be canceled, and the Riegers be ordered to return the purchase price paid to them to the Plaintiffs and /or IB Property Holdings, LLC according to their interests;  that the funds returned to the Plaintiffs be offset by the fair rental value of the property after January 4, 2007,  with such additional adjustments as equity may require  based on an accounting of the rents and profits by the Riegers from January 4, 2006 through March 30th, 2009, their breaches of the management agreement for the property with the Plaintiffs, and their tortious interference with the lease agreements between the Plaintiffs and the tenants of the property through the date of the Deed of Trust Sale to IB Holdings, and for such other and equitable relief as may be required to put the parties in the position, to the extent possible, they would be in had the purchase agreement not been entered into.

Alternatively the Plaintiffs pray for Judgment against each Defendant against whom this cause of action is alleged, jointly and severally in the amount of $345,000, but with the Riegers allowed a credit for $51,000.00, on said judgment,  and for the costs of this action.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

Comes now the Plaintiffs and for their third cause of action for negligent misrepresentation against the Defendants Matthew Wilson and Joe Wilson and Company, and reallege the allegations

21

contained in paragraphs 1 through 75 and further state as follows: .

76.     The said Defendants actively through the course of their business and employment,
supplied information in the form of a written appraisal to Endeavor, knowing that it would be
provided to the Plaintiffs, which was intended to indicate to Endeavor and the Plaintiffs that the
property had a value of $340,000 which was a much greater value than it actually had, and that
their were no impediments to cash flow from the property due to non compliance with fire codes.
The statements to that effect were false, or else were recklessly asserted by them without sufficient
knowledge as to whether or not they were true or false.

77.     Because the defendants failed to exercise reasonable care and competence in
obtaining or communicating correct information, the value contained in the appraisal was false, and
no information regarding non-compliance with fire codes was discovered and considered.

78. The appraisal was intentionally provided by the said Defendants for the guidance of the
Plaintiffs related to taking an assignment of the purchase Agreement, and to their mortgage lender
Silver Hill to influence said company to grant approval of Plaintiff's mortgage loan, which was a
condition precedent to closing the purchase agreement.

79. The Plaintiffs relied on the information provided in the appraisal, proceeding forward
to take assignment of the purchase agreement, obtain approval for financing, and then close the
purchase on the Property without making further investigation regarding the value of the Property,
or in assessing the accuracy of appraisal as it related to fire code compliance.

80.     The Plaintiffs were entitled to rely, were intended to rely, and did justifiably rely on
the information provided to them by the said Defendants through the appraisal.

81.     As a proximate cause of the negligent misrepresentation of the said Defendants, the
Plaintiffs incurred damages as set forth above.

82.     That as a direct and proximate cause of the aforesaid negligence of the Defendants,
Plaintiff Sandra has also experienced extreme mental anguish and distress in the past and are
reasonably certain to experience such mental anguish and distress in the future.

WHEREFORE, the Plaintiffs pray for judgment on their third cause of action against the said
Defendants in this cause and each of them jointly and severally, for special damages in the
reasonable amount of $345,000 and for general damages for mental anguish and emotional distress,

22

and for the costs of this action and attorney fees allowed by law.

## SIXTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE

Comes now the Plaintiffs and for their sixth cause of action against the Riegers reallege the allegations contained in paragraphs 1 through 82 and further state as follows:

83.    That after the Plaintiffs terminated   the contract with the Riegers to manage the properties on March 30, 2009, Plaintiffs obtained from the Riegers the keys to the common areas and rental units and the leases and security deposits of the tenants who were permitted to remain in the premises by the Fire Marshall's order.

84.    The Riegers were aware of each tenant remaining on the property, the terms of their lease, and the amount of their rent.

85.    Thereafter the Riegers intentionally interfered with the lease hold relationship Plaintiff had with each tenant, by coming on the property and soliciting the existing tenants who were allowed to remain by the Fire Marshall's order, to break their leases with Plaintiffs vacate the premises and enter new leases for rental property owned by the Riegers. They also attempted to assert an assignment of rents and collect rents from the tenants, knowing that Silver Hill had a superior right to collect said rents.

86.    The aforesaid interference with existing leases was unjustified, and the Riegers knew that once a tenant vacated, they could not be replaced under Fire Marshall's order imposing greater financial distress on the Plaintiffs.    Plaintiffs gave notice to the Riegers to no longer enter the property, for any purpose, but the Riegers intentionally ignored the notice and continued to try to solicit tenants to break their lease.

87.    Through said interference several of the tenants of the Property  did breach their leases, vacated the property and entered leases with the Plaintiffs.

88.    That but for the interference the tenants would have remained on the Property and paid rent and the Plaintiff has been damaged by the loss of rent in an amount of greater than $5000.00.

WHEREFORE, Plaintiffs pray for judgment on their sixth cause of action against the

23

Defendants named herein in the amount of $5000.00, plus the costs of this action.

## SEVENTH CAUSE OF ACTION
## BREACH OF MANAGEMENT CONTRACT

Comes now the Plaintiffs and for their sixth cause of action against the Riegers reallege the allegations contained in paragraphs 1 through 88 and further state as follows:

89.     The Defendants Rieger owed the Plaintiffs an implied duty of good faith and fair dealing implied in the terms of every written agreement in this State, and implied within the management agreement entered into between the Plaintiffs and the Riegers. They also owed Plaintiffs and implied duty to perform the services required by the agreement in a good and workmanlike manner.

90.     The Riegers breached the said agreement including the covenant of good faith and fair dealing and the covenant to perform services in a good and workmanlike manner, by:

      a.     Engaging in self dealing to acquire prospective tenants for their own rental properties instead of leasing them a unit in the Property.

      b.     Contracting with themselves and other family members to provide maintenance services, snow removal and landscaping at exorbitant prices fair in excess of the normal prices for such services prevalent in the community at the time the services were rendered.

      c.     Failing to maintain an accurate account of rents received and expenses incurred.

      d.     Failing to accurately account to Endeavor and the Plaintiffs regarding their services.

      e.     Failing to provide management services in a professional manner in accordance with the standards for such services prevalent in the community where the property is located.

      f.     Charging an excessive mark up on consumables and other materials purchased for maintenance functions and for repairs to the premises

91.     The Plaintiffs have been damaged by the aforesaid breaches in an amount in excess

24

of $15,000.00.

WHEREFORE, Plaintiffs pray for judgment on their seventh cause of action against the Defendants named herein in the amount of at least $15, 000.00, plus the costs of this action.

## EIGHTH CAUSE OF ACTION
## CIVIL CONSPIRACY

Comes now the Plaintiffs and for their eighth cause of action against all the Defendants, reallege the allegations contained in paragraphs 1 through 91 and further state as follows:

92.    The Defendants, Reyes, Kinnick, Vega , John Does I-V, Level One, Wilson, Star Capital and Endeavor ( the Reyes Group) , and the Defendants the Riegers, the Guhdes, Bernard, Bennet, and Wilson, ( The Rieger Group)  or alternatively each Group of Defendants, independent of the other Group, entered into an agreement or understanding to defraud the Plaintiffs by convincing them to invest in and  purchase of the Property for almost five times less than it was worth even if the property were operable as rental property,  and despite its non compliance with fire codes, which the Defendants knew would make the property worthless. Additonally, the Reyes group entered into an agreement or understanding to defraud Plaintiffs by enticing them to purchase and close on the Property, to  defraud them by collecting an exorbitant portion of  the rents and profits expected to be generated  from the Property

93.    The Defendants each entered into the acts attributed to them and  described above in furtherance of the conspiracy and  to deprive the Plaintiff of her investment money and/ or rents and profits of the property for their own improper and excessive gain.

94.    The Plaintiffs have been damaged by the aforesaid acts committed pursuant to the conspiracy in the amount of $345,000, and for the costs of this action, with such offset to the Reigers as the court shall allow.

WHEREFORE, Plaintiffs  prays of judgment against the Defendants  on their Eighth cause of action for $3450,000, plus the costs of this action, with such offsets  to the Reigers as the court shall allow.

## NINTH CAUSE OF ACTION

25

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO).

Comes now the Plaintiffs and for their eighth cause of action against the Defendants consisting of the Reyes Group as defined above, and reallege the allegations contained in paragraphs 1 through 94 and further state as follows:

95.     Said Defendants associated together as a group, as set forth above, for the common purpose of engaging in a pattern of racketeering activity, more particularly described below. Such an association of persons and entities is an enterprise for purposes of 18 U.S.C. §1961.

96.     Level One was a Delaware Corporation engaged in a nationwide scheme of locating investment properties on the internet to defraud potential investors targeted by them. It utilized the Internet to locate and contact potential sellers using email and facsimile transmissions over interstate phone lines, to communicate with potential sellers and to transmit false information to the Plaintiff as a prospective investor. It associated with Endeavor, a Nevada Corporation, formed to enter a joint venture with the Plaintiffs. The Defendants Level One and Endeavor used facsimile and email over phone lines extending across the United States from California to Nevada to Nebraska to Connecticut and also the U.S. Mail to forward appraisal reports and other false information related to a potential property from Nebraska to Connecticut or California to Connecticut to induce the prospective investor who lived in Connecticut to purchase the property. Accordingly, the enterprise or activities associated with the enterprise affected interstate commerce.

97.     The sending of false property information, inaccurate inspections, fraudulent appraisals, and other false information both over the phone lines and through the U.S. Mail on multiple occasions from August, 2006 through closing on January 4, 2007, constitutes the predicate acts of mail fraud and wire fraud in violation of 18 U.S.C. §§1341 and 1343.

98.     These Defendants have engaged in the same or similar fraudulent schemes with regard to other prospective investors, from all over the United States, and have therefore engaged in a pattern of racketeering activity, and are still engaged in a pattern of racketeering activity, which threatens to continue in the future with regard to each member of the enterprise

26

participating in the formation of new joint ventures  with prospective investors to defraud them, in the same manner as the Plaintiff was defrauded.

99.    The Plaintiffs have personally suffered injury  through the loss of $39,000 in cash paid as a down payment and for closing costs on the property, and have incurred a liability which exists to date in the amount of at least $305,000 , all because of the violations of the RICO law as set forth above.

WHEREFORE, Plaintiffs pray for judgment on their ninth cause of action for triple the damages  incurred, and attorney fees allowed by law under 18 U.S.C. §1964 c.

## TENTH  CAUSE OF ACTION
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO) 18 U.S.C. §1962 (d) -CONSPIRACY .

Comes now the Plaintiffs and for their Tenth cause of action against Defendants (Reyes Group)  reallege the allegations contained in paragraphs 1 through 99 and further state as follows:

100.  Each of the said Defendants has manifested that it entered an agreement to participate in the affairs of the stated enterprise in through the commission of two or more predicate acts as described above, and to violate 18 U.S.C. §1962 (c.  as set forth above. Therefore the manifestation of such agreement by each of the stated Defendants constitutes a violation of 18 U.S.C.. 1962(d).

101.   The Plaintiffs have been damaged by this violation as set forth in Paragraph 99 above.

WHEREFORE, The Plaintiffs pray for triple the amount of their damages, the costs of this action and attorney fees under 18 U.S. C. §1964 (c)

## ELEVENTH   CAUSE OF ACTION
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO).

27

Comes now the Plaintiffs and for their eleventh cause of action against the Defendants described as the Rieger Gorup above, and reallege the allegations contained in paragraphs 1 through 101 and further state as follows:

102.    Defendants in the Rieger Group associated together as set forth above for the common purpose of engaging in a pattern of racketeering activity, more particularly described below. Such an association of persons and entities is an enterprise for purposes of 18 U.S.C. §1961.

103.    The members of said Group engaged in a nationwide scheme of advertising grossly overpriced commercial investment properties for sale over the internet to defraud potential purchasers. They utilized the Internet to respond to Level One as a potential seller using email and facsimile transmissions over interstate phone lines, and otherwise to to transmit false information to Level One, and then later Endeavor and the Plaintiffs.   They associated between themselves to conceal that the properties offered for sale on the Internet had fire code violations greatly depreciating the income from what they represented could otherwise be obtained.    They used facsimile and email over phone lines extending across the United States from Nebraska to California to Nevada to Connecticut, and also the U.S. Mail on an interstate basis to forward false information in furtherance of their fraudulent scheme. Accordingly, the enterprise or activities associated with the enterprise stated above, affected interstate commerce.

104.    The sending of false property information, inaccurate rent rolls, misrepresented values, and other false information both over the internet via phone lines and facsimile via phone lines and through the U.S. Mail on multiple occasions from August, 2006 through closing on January 4, 2007, constitutes the predicate acts of mail fraud and wire fraud in violation of 18 U.S.C. §§1341 and 1343.

105.    These Defendants have engaged in the same or similar fraudulent schemes with regard to other prospective purchasers of property they have listed for sale, all over the United States, and have therefore engaged in a pattern of racketeering activity, and are still engaged in a pattern of racketeering activity, which threatens to continue in the future with regard to each member of the enterprise participating in the same manner, again and again to defraud prospective purchasers in the same manner as the Plaintiffs were defrauded.

106.    The Plaintiffs have personally suffered injury through the loss of $39,000 in cash

28

paid as a down payment and for closing costs on the property, and have incurred a liability which exists to date in the amount of at least $305,000 , all because of the violations of the RICO law as set forth above.

WHEREFORE, Plaintiffs pray for judgment on their ninth cause of action for triple the damages  incurred, and attorney fees allowed by law under 18 U.S.C. §1964 (c).

## TWELFTH   CAUSE OF ACTION
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO) 18 U.S.C. §1962 (d) -CONSPIRACY .

Comes now the Plaintiffs and for their Twelfth  cause of action against Defendants ( The Rieger Group)  reallege the allegations contained in paragraphs 1 through 106, and further state as follows:

107. Each of the said Defendants has manifested that it entered an agreement to participate in the affairs of the stated enterprise through the commission of two or more predicate acts as described above, and to violate 18 U.S.C. §1962 (c).   as set forth above.   Therefore the manifestation of such agreement by each of the stated Defendants constitutes a violation of 18 U.S.C.. 1962(d).

108.    The Plaintiffs have been damaged by this violation as set forth in Paragraph 106 above.

WHEREFORE, The Plaintiffs pray for triple the amount of their damages, the costs of this action and attorney fees under 18 U.S. C. §1964 (c).

## THIRTEENTH   CAUSE OF ACTION
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO) 18 U.S.C. §1962 (d) -CONSPIRACY .

Comes now the Plaintiffs and for their Thirteenth   cause of action against all  Defendants

29

and  reallege the allegations contained in paragraphs 1 through 108 and further state as follows:

109.  Each of the said Defendants has manifested that it entered an agreement to participate in the affairs of the stated enterprise through the commission of two or more predicate acts as described above, and to violate 18 U.S.C. §1962 (c.  as set forth above.  Therefore the manifestation of such agreement by each of the stated Defendants constitutes a violation of 18 U.S.C.. 1962(d).

110.  The Plaintiffs have been damaged by this violation as set forth in Paragraph 106 above.

WHEREFORE, The Plaintiffs pray for triple the amount of their damages, the costs of this action and attorney fees under 18 U.S. C. §1964 (c).

SJT DEVELOPMENT, INC., a Nevada Corporation and SANDRA TRIANTAFILLOS, PLAINTIFFS,

BY:

Allan J. Eurek, #16833
ALLAN J. EUREK & ASSOC., P.C.
3901 Normal Blvd., Suite 203
Lincoln, NE 68506-5205
(402) 477-7500

30

Nov. 16. 2010  4:19PM    ALLAN J EUREK PC 402-477-7525                     No. 2278   P. 32
SEP. 07 2000 THU 11:07 AM Iovalone financial         FAX NO. 18083739109          P. 02

THIS IS A LEGALLY BINDING AGREEMENT. IF NOT UNDERSTOOD, SEEK LEGAL ADVICE.

COMMERCIAL
PURCHASE AGREEMENT



The undersigned, as Buyer, agrees to purchase the following property on the following terms:

Address: _____

Legal Description: _____

Price. Buyer agrees to pay $ _____

... (document heavily degraded and largely illegible) ...

Buyer _____  Seller _____

EXHIBIT
A

**Marketing Termination or Default** If Buyer fails to consummate this purchase according to the terms of this agreement, Seller may, at Seller's option, retain the earnest money as liquidated damages for such failure, or utilize such other legal remedies as are available to Seller by reason of such failure. If this agreement is rescinded or terminated by either party without fault as allowed hereby, each party shall bear his or her costs and the earnest money shall be refunded.

**F.I.R.P.T.A.** (Foreign Investment and Real Property Tax Act) The foreign investment and Real Property Tax Act requires a Buyer of real property to withhold ten percent (10%) of the sale price and to deposit that amount with the Internal Revenue Service upon closing, if the Seller is a foreign person. Foreign corporation or partnership, or non-resident alien, unless the property qualifies for an exemption under the act. Unless it is established that this transaction is exempt because the purchase price is $300,000 or less and the Buyer intends to use the property as his primary residence, Seller agrees to: (a) Provide Broker with a Non-Foreign Seller Affidavit (FFC Form 1011-V) stating under penalty of perjury that Seller is not a foreign person; or: (b) Provide Broker with a Certificate from the Internal Revenue Service establishing that no federal income tax withholding is required; or (c) Subparagraphs (a) or (b) to be provided to Buyer within _____ days of acceptance or Seller consents to withholding ten percent (10%) from the sale proceeds, to be deposited with the Internal Revenue Service.

**Tax Deferred Exchange:** In the event the Seller wishes to enter into a tax deferred exchange for the real property described herein, or if Buyer wishes to enter into a tax deferred exchange with respect to property owned by him in connection with this transaction, each of the parties agrees to cooperate with the other party in connection with such exchange, including the execution of such documents as may be reasonably necessary to effectuate the same. Provided that: (a) The other party shall not be obligated to delay the closing, (b) All additional costs in connection with the exchange should be borne by the party requesting the exchange, and (c) The other party shall not be obligated to execute any note, contract, deed, or other document providing for any personal liability which would survive the exchange, nor shall the other party be obligated to take title to any property other than the property described in this agreement. The other party shall be indemnified and held harmless against any liability which arises or is claimed to have arisen on account of the acquisition of the exchange property.

**Rights of Parties in Possession** ☑ If checked, this property is sold subject to the rights of persons in possession. Rents shall be prorated to date of closing. Security deposits, advance rentals or considerations involving future lease credits shall be credited to Buyer. Buyer acknowledges that trade fixtures located in the premises may belong to tenants and may be removed upon the conclusion of the tenancy. ☑ If checked, purchaser is subject to Buyer's inspection and approval of the lease which shall be treated as an inspection above. Promptly after execution hereof, Seller shall provide Buyer with copies of all leases and rental agreements, notices to or from tenants, claims made to or by tenants, a statement of rents owing and damage or security deposits held and a summary of all oral agreements with tenants which affect the operation or ownership of the premises. Seller shall warrant the foregoing disclosures as true and correct. Seller agrees that no change in the existing leases or rental agreements shall be made nor new leases or rental agreements entered into nor shall any substantial repairs or alterations be commenced without the express written consent of the Buyer. Buyer's obligations hereunder are conditioned upon receipt at closing of an estoppel certificate from each tenant acknowledging the terms of rental agreement in effect, that no lessor default exists, and stating the amount of any prepaid rents or deposits.

**Income/Expenses:** ☐ If checked, the purchase is subject to Buyer's inspection and approval of the operating statement of the premises. Promptly after execution hereof Seller shall provide a statement of rental income and expenses for the premises which Seller shall warrant as true and correct. Such inspection shall be treated as an inspection above.

**Service Contracts:** Seller agrees to provide to Buyer a copy of any service and/or equipment contracts with respect to the property which extend beyond closing. Buyer agrees to assume such contracts.

**Environmental:** ☐ If checked, the purchase is contingent upon the satisfactory environmental quality of the Property. On or before the inspection deadline, Buyer may request a Phase I environmental review at its expense which shall be promptly ordered. If this results in a question of environmental quality, Buyer may request further study and delay closing as necessary, accept the property as is or rescind this agreement. If further study is requested, Buyer shall have ten days after receipt of the study results to accept the property as is or rescind this agreement. Copies of all reports for environmental investigation and the results thereof shall be provided to both Buyer and Seller. If the environmental investigation is not completed by _____, either party may rescind this agreement.

**Use:** ☐ If checked, Buyer intends to use the premises for a specific purpose. Buyer may rescind this agreement on or before the resolution deadline if Buyer determines that zoning or land use restrictions prohibit such intended use. The purpose is as follows: rental property

**Acceptance Date:** This offer in full and void if not accepted by 5:00 p.m. on or before _September 8_, 2006 at _6_ o'clock p.m.
**Counterparts:** This agreement may be executed in one or more counterparts, each of which is deemed to be an original hereof, and all of which together constitute one and the same instrument.

**Fax Transmission:** The facsimile transmission of a signed copy hereof or any counter offer to the other party or his/her agent followed by faxed acknowledgement of receipt, shall constitute delivery of said signed document. The parties agree to confirm such delivery by mailing an personally delivering a signed copy to the other party or his/her agent.

**Entire Agreement:** This document contains the entire agreement of the parties and supersedes all prior agreements or representations oral or written with respect to the Property which are not expressly set forth herein or incorporated herein by reference. This purchase may be modified only by a writing signed and dated by both parties. All express representations and Warranties shall survive closing. Both parties acknowledge that they have not relied on any statements of the real estate agent or broker which are not herein expressed except _____ none .

| BUYER | _Jeremy Kinnick and/or Assigns_ | DATE | 9/7/06 | SS#/FedID# |
| BUYER | | DATE | | SS#/FedID# |
| ADDRESS | | | ZIP | PHONE |
| BUYERS' limited agent is | none | (agent) of | Barnard Real Estate | (company) |

NAMES FOR DEED: Jeremy Kinnick and/or Assigns

**RECEIPT FOR EARNEST MONEY**

RECEIVED FROM: _____ $ _____ (by _____ ) to apply to the purchase price of Property on terms and conditions as stated, in the event this offer is not accepted by the Seller or if the Property within the time specified, or if there are any defects in the title which cannot be cured as specified above, the Deposit shall be refunded.
_Barnard Real Estate_  REALTOR® By: _Dana M. Guhde (Received upon acceptance)_

☐ This offer has been countered.

**ACCEPTANCE**

Seller accepts this agreement on the terms stated and agrees to convey title to Property, deliver possession, and perform all the terms and conditions set forth.

| SELLER | _David L. Blague_ | DATE | | SS#/FedID# |
| SELLER | _Rachel L. Blague_ | DATE | 9-7-06 | SS#/FedID# |
| SELLERS' limited agent is | _Dana M. Guhde, GRI_ | (agent) of | Barnard Real Estate | (company) |

| STATE OF _____ | | STATE OF _____ | |
| COUNTY OF _____ } ss: | | COUNTY OF _____ } ss: | |

The foregoing purchase agreement was acknowledged before me on _____ by _____

Notary Public     Commission Expires

The foregoing purchase agreement was acknowledged before me on _____ by _____

Notary Public     Commission Expires

**RECEIPTS FOR FULLY EXECUTED PURCHASE AGREEMENT**

Buyer acknowledges receipt of executed copy of this agreement.

| BUYER | _Jeremy Kinnick and/or Assigns_ | DATE | 9/7/06 |
| BUYER | | DATE | |

Seller acknowledges receipt of executed copy of this agreement.

| SELLER | | | David L. Blague | DATE | |
| SELLER | _Rachel Blague_ | | Rachel L. Blague | DATE | 9-7-06 |

© 2003 Nebraska REALTORS® Association

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035, (313) 313-1088 www.zipform.com     Blague Avenue

Addendum to contract dated ___SEPT  7TH_____, 20 0 6 between

Seller(s)_____and

Buyer(s) _JEREMY KINNICK AND/OR ASSIGNS_____

Seller(s) and Buyer(s) make the following terms and conditions part of the contract: _____

- THIS ADDENDUM IS IN ADDITION TO THE ADDENDUM FROM SELLING AGENT SENT ON 10/8/06

- BUYER ACKNOWLEDGES THE FACT SELLER WILL PAY $13,000 TO ROOFERS, INC. TO REPAIR ROOF. SELLER WILL MAKE NECESSARY AMENDMENTS TO COVER THE ADDITIONAL COST, IN THE EVENT REPAIR COST IS MORE THAN ORIGINALLY CALCULATED.

- BUYER TO APPROVE COMPLETION OF WORK.

- SELLER TO COMPLETE ALL NOTED AND REFERENCED REPAIRS FOR ELECTRICAL.

- Seller to pay up to $15,000 total to repair roof as needed based on original bid from Roofers, Inc.   RR  JR 10/03/06

_____        _____
        Buyer                              Date

_____        _____
        Buyer                              Date

_____        _____
        Seller                             Date

_____        _____
        Seller                             Date

23

This is a legally binding agreement. If not understood, seek legal advice.

# Amendment A to Purchase Agreement

The Seller and Buyer named in the Purchase Agreement dated September 7th, 2006, for the sale of the property located at 1301 19th Street, Auburn, NB, agree to the following terms in addition to or as modifications of those stated in the Agreement:

1. Purchase agreement is amended to assign all rights to this property from Jeremy Kinnick and/or assigns to:

   Sandra Triantafillos
   139 Bowers Hill Road
   Oxford, CT 06478
   Phone Number:_____

2. Closing date to be November 30th, 2006 or within 5 days of all phases of this transaction being cleared to close.

3. _____
   _____
   _____
   _____

Dated: __11-17__, 2006          Dated: __11 110 :__, 2006

Time: _____                Time: __1:50p__

_____          _____
Seller                            Buyer

_____          _____
Seller                            Buyer

Nov. 16. 2010. 4:20PM.  ALLAN J EUREK PC 402-477-7525          No. 2278   P. 36
                  10. 01.27 fu iovelone financial     FAX NO. 19093739190
                                                                         P. 04
         Oct 03 06 05:54p    Deana Gehle                    4022422192   p4

This is a legally binding agreement, if not understood, seek legal advice.



## Addendum to Purchase Agreement

The Seller and Buyer named in the Purchase Agreement dated _____ September 7, 2006 _____,
for the sale of _____ 1301 19th Street, Auburn, NE 68305 _____
agree to the following terms in addition to or as modifications of those stated in the Agreement:

It is the intention of Seller to transfer the above-listed property pursuant to
Internal Revenue Code Section 1031, which sets forth the requirements for
tax-deferred real estate exchanges. Seller's rights and obligations under this
and future agreements may be assigned to a qualified intermediary for the
purpose of completing an exchange. Buyer of the above-listed property agrees to
cooperate with Seller in a manner necessary to enable Seller to complete said
exchange. Such cooperation shall be at no additional cost or liability to
Buyer.

_____

_____

_____

_____

Dated  _10-3-06_                    Dated  _10-3-06_

Seller David A. Krogar            Buyer Jeremy Kinnick and/or assigns

Seller Rachel L. Krogar            Buyer

© 1991 Nebraska REALTORS® Association

Nov. 16. 2010  4:20PM    ALLAN J EUREK PC 402-477-7525              No. 2278   P. 37

Dec 15 06 09:52a    Stephen Murden                          5403426520          p.1
DEC-15-2006  10:43 AM                                                        P. 01

## Addendum to Commercial Purchase Agreement

It is understood and agreed by Buyer and Seller that the contract dated September 7, 2006 for the purchase of 1301 19th Street, Auburn, NE is amended as follows:

Purchase Price:          $340,000

Loans:
    First Mortgage:      $255,000

    Second Mortgage:     $51,000 (held by seller)
    Terms of second mortgage:   3 years interest-only, 6.50% interest rate, balloon in 3 years

_____  12-14-06
(Buyer)                  (Date)

_____  12-15-06
(Seller)                 (Date)

Nov. 16. 2010  4:20PM  ALLAN J EUREK PC 402-477-7525                    No. 2278   P. 36
                                                    FAX NO. 19003733565            P. 01/01

This is a legally binding agreement. If not understood, seek legal advice.

# Ackowlegement

The Seller and Buyer named in the Purchase Agreement dated September 7th, 2006, for the sale of the property located at 1301 19th Street, Auburn, NE, agree to the following terms in addition to or as modification of those stated in the Agreement.

1. Seller to provide cashier's checks as follows on the day of funding:

   a. For $5092.77 for security deposits and rent proration for the month of January held by the Sellers, payable to SJT Development, Inc.

   b. For electrical repairs agreed upon between the buyer and seller, $3380.00 payable to Combs Electric and held by Barnard Real Estate until the work on the apartments has been completed and SJT Development, Inc. has authorized release of funds to the vender.

   c. For roof repairs agreed upon between the buyer and seller, $13,000.00 payable to Roofers Inc. and held by Barnard Real Estate until the work on the apartment roof has been completed and SJT Development, Inc. has authorized release of funds to the vendor. Should the cost to repair the roof run over $13,000.00, Sellers agree to pay up to $2,000.00 more to the vender to cover the difference between $13,000.00 and $15,000.00.

2. Closing date to be January 4th, 2007 or within 5 days of all phases of this transaction being cleared to close.

3. _____
   _____
   _____
   _____

Dated: Jan 4th, 2007           Dated: Jan 4th, 2007

Time: 4:00 PM                  Time: 9:15 pm

_____        _____
Seller                         Buyer

_____        _____
Seller                         Buyer

GV# 200051320  MV# 3011311 (1).



## APPRAISAL OF REAL PROPERTY

**LOCATED AT:**
1301 18th St
Calvert First Addition, Block 4, Lot 1
Auburn, NE 68305-2352

**FOR:**
Endeavor Development & Investing Group, Inc.
8558 Utica Ave. #100
Rancho Cucamonga, CA 91730

**AS OF:**
October 10, 2008

**BY:**
Matthew J. Wilson

EXHIBIT
B

Nov. 16. 2010  4:20PM    ALLAN J EUREK PC 402-477-7525          No. 2273   P. 40

BV# 200051320  MV# 3011311



## APPRAISAL OF REAL PROPERTY

**LOCATED AT:**
1301 19th St
Calvan First Addition, Block 4, Lot 1
Auburn, NE 68305-2352

**FOR:**
Endeavor Development & Investing Group, Inc.
8588 Utica Ave. #100
Rancho Cucamonga, CA 91730

**AS OF:**
October 10, 2006

**BY:**
Matthew J. Wilson

Form GA1 — "WinTOTAL" appraisal software by a la mode, Inc. — 1-800-ALAMODE

File No. 00-1241

## Subject Photo Page

| Borrower/Client | Endeavor Development | | | | |
|---|---|---|---|---|---|
| Property Address | 1201 19th St | | | | |
| City | Auburn | County Nemaha | | State NE | Zip Code 68305-2352 |
| Lender | Endeavor Development & Investing Group, Inc. | | | | |



**Subject Front**
1107 Central Avenue
Sales Price        150,000
G.B.A.
Age/Yr.Bt.        20



**Subject Rear**



**Subject Street**

Form PIC3x5.SC — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Comparable Photo Page

| Borrower/Client | Endeavor Development | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1301 19th St | | | | | |
| City | Auburn | | County  Nemaha | | State  NE | Zip Code  68305-2352 |
| Lender | Endeavor Development & Investing Group, Inc. | | | | | |



### Comparable 1

1107 Central Ave
| | |
|---|---|
| Sales Price | 150,000 |
| G.B.A. | |
| Age/Yr. Blt. | 29 |



### Comparable 2

505 No. 12th
| | |
|---|---|
| Sales Price | 285,000 |
| G.B.A. | |
| Age/Yr. Blt. | 66 |



### Comparable 3

1302 N Street
| | |
|---|---|
| Sales Price | 71,000 |
| G.B.A. | |
| Age/Yr. Blt. | 00 |

Nov. 16. 2010  4:21PM    ALLAN J EUREK PC 402-477-7525          No. 2278   P. 43

File No. 00-1711

## Comparable Photo Page

| Borrower/Client | Endeavor Development | | | | |
|---|---|---|---|---|---|
| Property Address | 1301 19th St | | | | |
| City | Auburn | | County Nemaha | State NE | Zip Code 68305-2352 |
| Lender | Endeavor Development & Investing Group, Inc. | | | | |



**Comparable 4**

1715 4th Corso
Sales Price       245,000
Gross Building Area
Age                49

**Comparable 5**

Sales Price
Gross Building Area
Age

**Comparable 6**

Sales Price
Gross Building Area
Age

Form PIC3x5.CC — "WinTOTAL" appraisal software by a la mode, Inc. — 1-800-ALAMODE

**Location Map**

| Borrower/Client | Endeavor Development | | | | |
|---|---|---|---|---|---|
| Property Address | 1301 19th St | | | | |
| City | Auburn | County Nemaha | | State NE | Zip Code 68305-2362 |
| Lender | Endeavor Development & Investing Group, Inc. | | | | |



File No. 06-1241

## Building Sketch

| Borrower/Client | Endeavor Development | | | | |
|---|---|---|---|---|---|
| Property Address | 1301 19th St | | | | |
| City | Auburn | County | Nemaha | State  NE | Zip Code  68305-2352 |
| Lender | Endeavor Development & Investing Group. Inc. | | | | |



17.0'

Apartment Inaccessible

42.0'                42.0'

17.0'

Lower Level

Sketch by Apex™

Comments:

| | AREA CALCULATIONS SUMMARY | | | | BUILDING AREA BREAKDOWN | |
|---|---|---|---|---|---|---|
| Code | Description | Net Size | Net Totals | | Breakdown | Subtotals |
| GBA1 | Lower Level | 714.0 | 714.0 | Lower Level | | |
| | | | | 17.0 x  42.0 | | 714.0 |
| | | | | | | |
| | Net BUILDING Area | (Rounded) | 714 | 1 Item | (Rounded) | 714 |

Nov. 16. 2010  4:21PM   ALLAN J EUREK PC 402-477-7525          No. 2278   P. 46



## Building Sketch

| Borrower/Client | Endeavor Development | | | |
|---|---|---|---|---|
| Property Address | 1301 19th St | | | |
| City | Auburn | County Nemaha | State NE | Zip Code 68305-2352 |
| Lender | Endeavor Development & Investing Group, Inc. | | | |

**Comments:**

### AREA CALCULATIONS SUMMARY

| Code | Description | Net Size | Net Totals |
|---|---|---|---|
| GBA1 | First Floor | 4036.5 | 4036.5 |
| | Net BUILDING Area | (Rounded) | 4037 |

### BUILDING AREA BREAKDOWN

| Breakdown | | Subtotals |
|---|---|---|
| First Floor | | |
| 32.1 × 36.5 | 1171.7 |
| 3.7 × 13.3 | 78.6 |
| 0.8 × 6.5 × 13.3 | 43.1 |
| 0.5 × 6.0 × 3.5 | 1.1 |
| 0.5 × 0.0 × 0.0 | 0.0 |
| 9.8 × 61.1 | 598.6 |
| 35.3 × 70.8 | 1376.0 |
| 4.3 × 5.7 | 82.2 |
| 0.5 × 4.3 × 4.3 | 9.4 |
| 4.3 × 4.3 | 1.1 |
| 0.3 × 20.1 × 26.0 | 521.6 |
| 11 Items | (Rounded) | 4037 |

Form SKT.BLDSk — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 1211

## Building Sketch

| Borrower/Client | Endeavor Development | | | | |
|---|---|---|---|---|---|
| Property Address | 1301 15th St | | | | |
| City | Auburn | County | Nemaha | State | NE | Zip Code | 68305-3352 |
| Lender | Endeavor Development & Investing Group, Inc. | | | | |



Comments:

### AREA CALCULATIONS SUMMARY

| Code | Description | Net Size | Net Totals |
|---|---|---|---|
| GBA1 | Second Floor | 3510.9 | 3510.9 |
| | | | |
| | Net BUILDING Area | (Rounded) | 3511 |

### BUILDING AREA BREAKDOWN

| Breakdown | | Subtotals |
|---|---|---|
| Second Floor | | |
| 5.7 x | 13.9 | 79.4 |
| 6.1 x | 3.7 | 23.2 |
| 0.3 x | 6.1 | 6.4 |
| 4.1 x | 3.1 | 8.4 |
| 9.3 x | 9.8 | 48.0 |
| 9.8 x | 61.1 | 598.9 |
| 35.1 x | 50.7 | 1504.2 |
| 29.2 x | 39.8 | 881.2 |
| | | |
| 8 Items | (Rounded) | 3511 |

Form SKT.BLDG1 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE



**Flood Map**

| Borrower/Client | Endeavor Development | | | | |
|---|---|---|---|---|---|
| Property Address | 1301 19th St | | | | |
| City | Auburn | County Nemaha | | State NE | Zip Code 68305-2362 |
| Lender | Endeavor Development & Investing Group, Inc. | | | | |



File No. 00-1241

## Supplemental Addendum

File No. 00-1241

| Borrower/Client | Endeavor Development |
|---|---|
| Property Address | 1301 19th St |
| City | Auburn | County | Nemaha | State | NE | Zip Code | 68305-2352 |
| Lender | Endeavor Development & Investing Group, Inc. |

FINAL RECONCILIATION:

The cost approach lacks credibility in this report due to the lack of  apartment land sales and the difficulty in estimating accrued depreciation from all sources.  The subject is a 77 year old apartment complex and does not lend itself to a good analysis of value through the cost approach.

The income approach analyzes the goals of an investor.  Those goals in income producing property are twofold.  One, a return on the investment, and two, an expected return of the investment.  The return of the investment depends on the net operating income for the property and the return of investment is realized on resale.  Significant market rental and expense information was available for analysis in this approach and the value estimate is felt to be quite accurate.  The major weight is given to this approach.

The sales comparison approach is usually a strong indicator of value, especially when sufficient comparable data are found.  In this appraisal the appraiser analyzed the three available sales and this approach provides very good support to the income approach.

The market approach and income approaches lend valuable support to each other and both derived the same value estimate.  Therefore, the market value of the subject property as of August 8, 2006 is estimated at $340,000.

This is a summary report of a complete appraisal.

SCOPE OF WORK: Analysis of subject property was based on interior and exterior inspection, information gathered from county records, viewing the neighborhood, data from applicable maps. Comparable properties was based on MLS data, county records and exterior viewing. Sales comparison and Cost approach was were developed. Income approach was not applicable due to lack of adequate data.

CLIENT AND INTENDED USE OF APPRAISAL: This report is intended for use only in the analysis of real estate loan collateral  for mortgage lending purposes. This report is not intended for any other use. This report is intended for use only by Endeavor Development & Investing Group for federally related mortgage loan purposes.

HIGHEST AND BEST USE: The current use of the subject property and the use of the subject property reflected in the appraisal is that of a residential multi-family dwelling. This  residential multi-family use is the highest and best use of the real estate as of the date of the appraisal. This use is legally permissible, physically possible, financially feasible and maximally profitable.

## RESIDENTIAL INCOME PROPERTY
## MARKET DATA ANALYSIS

File No. 00-1241

| ITEM | SUBJECT | COMPARABLE NO. 4 | COMPARABLE NO. 5 | COMPARABLE NO. 6 |
|---|---|---|---|---|
| Address | 1301 19th St | 1715 4th Corso | | |
| | Auburn | Nebraska City | | |
| Proximity to subject | | 19.63 miles N | | |
| Map code | | | | |
| Lot size | 14,220 | 128.5 x 144 | | |
| Total description of building improvements | No. Units: 10  No. Vac. 2 | No. Units: 8  No. Vac. 0 | No. Units: ___ No. Vac. ___ | No. Units: ___ No. Vac. ___ |
| | Year Built: 90 | Year Built: 49 | Year Built: | Year Built: |
| | 3 Story - walk-up | 2 Story walkup | | |
| Quality | Average | Average | | |
| Condition | Average | Average | | |
| Income/cost factors | None | None | | |
| Parking | 8 slats off street | Off Street | | |
| (Type/spaces) | Average | Average | | |
| Building | 5696 Sq Ft | 5376 Sq Ft | | |

| | No. of | UNIT ROOM COUNT | | | No. of | UNIT ROOM COUNT | | | No. of | UNIT ROOM COUNT | | | No. of | UNIT ROOM COUNT | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Total | BR | Bath | Units | Total | BR | Bath | Units | Total | BR | Bath | Units | Total | BR | Bath |
| Unit breakdown | 1 | 4 | 2 | 1 | 8 | 4 | 2 | 1 | | | | | | | | |
| | 15 | 3 | 1 | 1 | | | | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Utl. paid by owner | Water/Sewer | | | | | | | |
| Data source | Inspection/Owner | | County Records | | | | | |
| Price | $ 550,000  ☐ Un/ ☒ F | | $ 245,000  ☐ Un/ ☐ F | | ☐ Un/ ☐ F | $ | ☐ Un/ ☐ F |
| Sale History-Offer | NA | | Sale | | | | |
| Date of sale | 8/7/06 | | 04/08 | | | | |
| | NA | | | | | | |
| Terms (including conditions of sale and financing terms) | | | | | | | |

Complete as many of the following items as possible using data effective at time of sale

| | SUBJECT | COMPARABLE NO. 4 | COMPARABLE NO. 5 | COMPARABLE NO. 6 |
|---|---|---|---|---|
| Gross Annual Income | $ 72,800 | $ 44,400 | $ | $ |
| Gross Ann. Inc. Mult. (1) | 4.82 | 5.52 | | |
| Net Annual Income | $ 46,235 | $ 26,035 | $ | $ |
| Expense Percentage (2) | 36.32 % | 43.61 % | % | % |
| Overall Cap. Rate (3) | % | 10.22 % | % | % |
| Price per unit | $ | $ 30,625 | $ | $ |
| Price per room | $ | $ | $ | $ |
| Price gross bldg. area | $ /sq. ft. bldg. area | $ /sq. ft. bldg. area | $ /sq. ft. bldg. area | $ /sq. ft. bldg. area |

Comments: _____

Form 71B (AC) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 08-1241

GENERAL COMMENTS (including comments on any items noted good or bad) The subject appears structurally sound and appears to have been periodically updated and maintained. With on going maintenance and updating the property should maintain its rentability and marketability.

CONDITIONS AND REQUIREMENTS OF APPRAISAL (include required repairs, replacements, policing, termite inspections, etc.)

## RECONCILIATION AND VALUE CONCLUSION

Indicated Value by the Cost Approach ........ ........ $ _351,423_

Indicated Value by the Market Approach ..... .. .. . $ _348,500_

Indicated Value by the Income Approach .. ........ ..... $ _350,000_

FINAL RECONCILIATION   The major weight is given to the Income Approach as it is the way that investors look at income producing property like the subject. However, the other approaches to value provide good support for the Income Approach. See attached Addendum.

I certify, that to the best of my knowledge and belief, the statements made in this report are true and I have not knowingly withheld any significant information; that I have personally inspected subject property, both inside and outside, and have made an exterior inspection of all comparable sales listed herein; that I have no interest, present or contemplated, in subject property or the participants in the sale; that neither the employment nor compensation to make said appraisal is contingent upon any value estimate and, that all contingent and limiting conditions are stated herein.   ☒ Certificate and Statement of Limiting Conditions (FHLMC Form 439 Rev. 9/90) applies   ( ☐ on file with Client   ☒ Attached)

As a result of my investigation and analysis, my estimate of Market Value of the subject property as of          October 10          19 08  ,  .....  ...

$ _350,000_

Date _October 12, 2008_            Appraiser _____   Matthew J. Watson
                                   If applicable, complete the following

Date _____            Appraiser _____

Date _____  ☐ Supervising or  ☐ Review Appraiser
                   ☐ Did  ☐ Did not Physically Inspect Property

### FOR LENDER'S USE ONLY (completion optional)

Loan Recommended $ _____ @ ____ %   Term ____ yrs.   Principal & Interest $ _____ /mo. $ _____ /annually
Subject to: _____

| | | | | |
|---|---|---|---|---|
| Borrower's Cost or Purchase Price | $ _____ | Appraised Value $ _____ | | Loan to Appraised Value _____ % |
| Unit: Per Unit | $ _____ | Per Room $ _____ | Per Sq. Ft. of Building Area $ _____ | |
| Gross Annual Forecasted Income | $ _____ | Gross Annual Income Multiplier _____ | Gross Capitalization Rate _____ % | |
| Forecasted Annual Expenses and Replacement Reserves | $ _____ ( _____ % of Gross Annual Forecasted Income) | | | |

FHLMC FORM 718 - Rev. 8/77                                                                      Page 4

Sec No. 08.3211

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 1301 19th St | 1107 Central Ave | 505 No. 12th | 1302 N Street |
| | Auburn | Auburn | Nebraska City | Auburn |
| Proximity to subject | | 0.62 miles NE | 20.42 miles N | 0.44 miles N |
| Map code | | | | |
| Lot size | 14,220 | 128.5 x 144 | 98 x 120 | Similar |
| Bldf description of building | No. Units: 16  No. Vac. 2 | No Units: 8  No. Vac. 0 | No. Units: 8  No. Vac. 0 | No. Units: 8  No. Vac. 0 |
| | Year Built: 19 00 | Year Built: 19 75 | Year Built: 19 68 | Year Built: 19 00 |
| Improvements | 3 Story - walk-up | 2 Story walk-up | 2 Story walk-up | 3 Story Wnk-up |
| | | 2 buildings | 2 buildings | Conversion |
| Quality | Average | Average | Average | Average |
| Condition | Average | Average | Average | Fair |
| Recreational facilities | None | None | None | None |
| Parking | 8 stalls off street | 10 stalls off street | Off Street | Off Street |
| Tenant appeal | Average | Average | Average | Average |
| Building | 6685 Sq Ft | 3695 Sq Ft | 6390 Sq Ft | 2960 Sq Ft |

| Unit breakdown | No. of Units | UNIT ROOM COUNT | | | | No. of Units | UNIT ROOM COUNT | | | | No. of Units | UNIT ROOM COUNT | | | | No. of Units | UNIT ROOM COUNT | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | BR | Bath | | | Total | BR | Bath | | | Total | BR | Bath | | | Total | BR | Bath | |
| | 1 | 4 | 2 | 1 | | 8 | 4 | 2 | 1 | | 8 | 4 | 2 | 1 | | 5 | 3 | 1 | 1 | |
| | 16 | 3 | 1 | 1 | | | | | | | | | | | | 1 | 2 | 1 | 1 | |

| Util paid by owner | Water/Sewer | Water/Sewer | Water/Sewer | Water/Sewer |
|---|---|---|---|---|
| Data source | Inspection/Owner | Inspection/Owner | County Records | Realtor Files |
| Price | $ 350,000  Unf. ☒ F | $ 150,000 ☒ Unf. F | $ 285,000 ☒ Unf. F | $ 71,000 ☒ Unf. F |
| Sale/Listing/Offer | NA | NA | Sale | Sale |
| Date of sale | 9/7/06 | 0608 | 02/08 | 04/06 |
| Terms (including conditions of sale and financing terms) | NA | Conv. | Conv. | Conv. |

Complete as many of the following items as possible using data effective at time of sale

| | | | | |
|---|---|---|---|---|
| Gross Annual Income | $ 72,600 | $ 44,400 | $ 48,000 | $ 21,720 |
| Gross Ann. Inc. Mult. (1) | 4.82 | 3.38 | 5.94 | 3.27 |
| Net Annual Income | $ 46,235 | $ 23,835 | $ 29,374 | $ 11,512 |
| Expense Percentage (2) | 36.32 % | 46.32 % | 38.80 % | 47.00 % |
| Overall Cap. Rate (3) | % | 15.89 % | 10.31 % | 16.21 % |
| Price per sq ft | $ | $ 18,750 | $ 35,625 | $ 1,833 |
| Price per room | $ | $ 76,090 | | |
| Price per sq. bldg. area | $  /sq. ft. bldg. area | $  /sq. ft. bldg. area | $  /sq. ft. bldg. area | $  /sq. ft. bldg. area |

(1) Sale Price / Gross Annual Income  (2) Total Annual Expenses / Total Gross Annual Income  (3) Net Annual Income / Price

RECONCILIATION:   Comps 1 & 3 are very recent sales in Auburn and comps 2 & 4 are recent sales in nearby Nebraska City. This is considered a very similar rental market and would compete for the same rental market and the same investors. Rents and expenses are similar for all the comparables and the subject. The indicated GRM is in the range of 3.27 to 5.94 and the subject is near the middle of this range. Most probable GRM is 4.8 which results in a value estimate of $348,480.

INDICATED VALUE BY MARKET APPROACH 348,300

| INCOME | | EXPENSES | ACTUAL | FORECASTED |
|---|---|---|---|---|
| Total Monthly Apartment Forecasted Rents | $ 6,050 | Real Estate Taxes | $ 936 | $ 960 |
| Other Monthly Income (itemize) | | Other taxes or licenses | | |
| | $ | Insurance | 1,200 | 1,200 |
| Total Gross Monthly Forecasted Income | $ 6,050 | Unsubordinated ground rent | | |
| Total Gross Annual Forecasted Income | $ 72,600 | Fuel | | |
| Less Forecasted Vacancy and Collection Loss ( 10 %) | $ 7,260 | Gas | 4,800 | 6,000 |
| Effective Gross Annual Income | $ 65,340 | Electricity | | |
| Less Forecasted Expenses & Replacement Reserves | $ 19,105 | Water and sewer | | |
| Net Annual Income from Total Property | $ 46,235 | Trash removal | | |
| Less Return on and Recapture of Depreciated Value of... | | Pest control | 200 | 200 |
| Furnishings ($ @ %) | $ | Maintenance and repairs | 3,254 | 3,300 |
| Net Annual Income from Real Property | $ 46,235 | Interior and exterior decorating | | |
| Capitalized as follows: | | Cleaning expenses and supplies | 200 | 200 |
| $46,235/.132 = $350,255 | | Management (off-site) | 0 | 4,558 |
| | | Res. Mgr. salary & apartment | | |
| Caped | $350,000 | Janitor(s) salary & apartment | | |
| | | Miscellaneous | 300 | 300 |
| Real Est. Taxes ☒ Actual ☐ Est. Tax Rate Per $100 $ 2.08358 | | | | |
| Total Assessed Value $ 45,240 | | REPLACEMENT RESERVES | | |
| Comments: There is a long rental and expense history and the | | Carpeting and drapes | | |
| data is considered strong. The market supports the | | Ranges and refrigerators | | |
| estimated market rents. | | Dishwashers and disposals | | |
| | | Individual heating & AC units | | |
| | | 150 per unit | 0 | 2,400 |
| | | TOTAL EXPENSES & REPL. RES. | $ 10,890 | $ 19,105 |
| | | INDICATED VALUE BY INCOME APPROACH $350,000 | | |

FHLMC FORM 71B - Rev. 8/77

Form 71B — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE                                   Page 3

Handwritten margin notes: 3103 un · <.25% decline $ from 7c1 · 55.7ε0 10 · 34,275 · 13 6 · 23,815 13.6 160 · 570UU 10% · 29,495 · .132 · $220,uu

File No. 00-1231

| ☒ Existing | Approx. Year Built 19 90 | ☐ Proposed | ☐ Under Construction | ☐ Owner | ☒ Vacant | No. of Stories 3 | 1 Row of Townhouse |

No. of Bldgs. 1   No. of Units 16   No. of Rooms ____   No. of Units ____   Parking Spaces No. 6   Type Off Street
Basic Structural System  Masonry                          Exterior Walls  Brick                 Roof Covering  Built-up
Interior Walls  Pa Plea                                   Floors  Carpet, oak, vinyl            Sub Floor and Walls  Oak, tile/Pa Plas
Insulation  Unknown                                       Adequacy Unknown                Adequacy and Soundproofing  Average
Heating:  ☐ Central  ☒ Individ   Type FA                  Fuel Gas & Elec     Condition  Avg.
Air Conditioning:  ☐ Central  ☒ Individ   Describe  Window Units                          Adequacy and Condition  Average
Elevator(s): Number  0        Automatic  0
Security Features  None

| Kitchen cabinets, drawers and counter space | ☒ Adequate | ☐ Inadequate | | OVERALL PROPERTY RATING | Good | Avg | Fair | Poor |
|---|---|---|---|---|---|---|---|---|
| ☒ Range/Oven | ☐ Fan/Hood | ☐ Dishwasher | ☐ Disposal | General appearance of property | | ☒ | | |
| ☒ Refrigerator | ☐ Washer | ☐ Dryer | | Quality of construction (materials and finish) | | ☒ | | |
| Hot Water Heater(s)  Common Gas Fired | | | | Condition of improvements | | ☒ | | |
| Plumbing Fixtures  Average Quality | | | | Rooms size and layout | | ☒ | | |
| Electrical Service  17 glen. services | | | | Closets and storage | | ☒ | | |
| Recreational Facilities  None | | | | Plumbing-adequacy and condition | | ☒ | | |
| | | | | Electrical-adequacy and condition | | ☒ | | |
| | | | | Kitchen and parking facilities | | ☒ | | |
| Effective Age 30  Yrs.   Estimated Remaining Economic Life 30  Yrs. | | | | Appeal to market | | ☒ | | |

COMMENTS: (Special features, functional or physical inadequacies, repairs needed, modernization, etc.)The subject is in above average overall condition with ongoing maintenance and updating. The mechanical systems appear to be adequate. Some of the units have been updated with electric heat, newer flooring, kitchens and baths. Most of the units are in above average condition.

LAND SALES (complete Only if appropriate for this appraisal)

| | Zoning | Area | Sales Price | Date | Price per Sq. Ft. or per Unit |
|---|---|---|---|---|---|
| 1. | | $\sqrt{1/1}$ | | $ | Per |
| 2. | | $\sqrt{1/1}$ | | $ | Per |
| 3. | | $\sqrt{1/1}$ | | $ | Per |

Comments & Reconciliation  No recent land sales in this area.

Estimated Land Value  $ 40,000

APARTMENT BUILDING(S)-ESTIMATED REPRODUCTION COST NEW

| | | Sq. ft. X ___1___ (Stories) = | 4,037  Sq. ft. X $ | 63.93 | $ | 217,715 |
|---|---|---|---|---|---|---|
| X | | Sq. ft. X ___2___ (Stories) = | 7,022  Sq. ft. X $ | 53.93 | $ | 378,698 |
| X | | Sq. ft. X ___1___ (Stories) = | 714  Sq. ft. X $ | 25.82 | $ | 10,435 |

OTHER IMPROVEMENTS  Appliances                                                              $ 9,000

TOTAL ESTIMATED COST NEW OF IMPROVEMENTS                                                   $

LESS DEPRECIATION  EH App: 35  REM :35
DEPRECIATED VALUE OF IMPROVEMENTS                                                          $ 311,423
ADD-ESTIMATED LAND VALUE                                                                   $ 40,000
INDICATED VALUE BY THE COST APPROACH (FEE SIMPLE)                                          $ 351,423
IF LEASEHOLD DEDUCT VALUE OF FEE INTEREST (ATTACH CALCULATIONS)                            $ 0
INDICATED VALUE BY THE COST APPROACH (LEASEHOLD)                                           $ 351,423

| ITEM | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|
| Address | 1400 K Street | 20th & L | 2513 L Street |
| | Auburn | Auburn | Auburn |
| Proximity to subj. | 0.4 miles NE | 0.19 miles SE | 0.44 miles SE |
| Data source date | 04/08 | 04/08 | 08/08 |
| Brief description of property improvements | No. Units  12  No. Vacant  0   Age  78 Yrs | No. Units  4   No. Vacant  0   Age  41 Yrs | No. Units  4   No. Vacant  0   Age  41 Yrs |
| | Two Story | Two Story | Two Story |
| | Average Quality | Average Quality | Average Quality |
| | Average Condition | Average Condition | Average Condition |

| | Rm. Count | Size | Monthly Rent | | Rm. Count | Size | Monthly Rent | | Rm. Count | Size | Monthly Rent | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Individual unit breakdown | Tot BR b | Sq. ft. | $ | /b | Rm | Tot BR b | Sq. ft | $ | /b | Rm | Tot BR b | Sq. ft | $ | /b | Rm |
| | 4 2 1 | | | | | 605 | 325 | 0.36 | 81 | | 4 2 1 | 832 | 300 | 0.36 | 75 |
| | 3 1 1 | | | | | 888 | 310 | 0.35 | 76 | | | | | | |
| | 5 3 1 | | | | | 896 | 350 | 0.39 | 88 | | | | | | |
| | | | | | | 896 | 350 | 0.39 | 88 | | | | | | |

| Utilities, furniture and amenities included in rent | Furnished | Unfurnished | Unfurnished |
|---|---|---|---|
| | Off Street Parking | Off Street Parking | Off Street Parking |
| Comparison to subject including rental concessions, if any | Equal Location | Equal Location | Equal Location |
| | Equal Condition | Equal Condition | Equal Condition |
| | Some sleeping rooms | All two BR | All two BR |

Utilities included in actual rents:  ☒ Water  ☐ Gas  ☐ Heat  ☐ Electric  ☐ Air Conditioning  ☒ Sewer
Utilities included in forecasted rents:  ☒ Water  ☐ Gas  ☐ Heat  ☐ Electric  ☐ Air Conditioning  ☒ Sewer

| No. of Units | Unit RM Count | Total Rooms | No. Units Per Unit | ACTUAL RENTS | | | | | FORECASTED RENTS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tot. BR b | | Sq. Ft. Area Per Unit | Vacant | Unfurnished | Per Unit Furnished | Total Rents | Per Unit Unfurnished | Per Unit Furnished | Total Rents | Per Sq. ft. or Room |
| 5 | 3 1 1 | 18 | 0. | | $ | 375 | $ 2,250 | | $ 375 | $ 1,250 | $ 125 |
| 4 | 3 1 1 | 12 | (2.) | | 400 | 800 | | 400 | 1,600 | 133 |
| 1 | 3 1 1 | 3 | 0 | | 325 | 325 | | 325 | 325 | 108 |
| 1 | 4 2 1 | 4 | 0 | | 475 | 475 | | 475 | 475 | 119 |
| 1 | 3 1 1 | 3 | 0 | | 275 | 275 | | 275 | 275 | 92 |
| 2 | 3 1 1 | 6 | 0 | | 350 | 700 | | 350 | 700 | 117 |
| 1 | 4 2 1 | 4 | 0 | | 425 | 425 | | 425 | 425 | 100 |
| 16 | TOTAL | 50 | 2 | | | $ 5,250 | | | $ 5,050 | |

PHLMC FORM 71B - Rev. 8/77                                                               Page 2

Form 71B — "WINTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Nov. 16. 2010  4:22PM    ALLAN J EUREK PC 402-477-7525          No. 2278   P. 55

File No. 06-1241

**Summary Appraisal Report**                    Wilson Appraisal
### APPRAISAL REPORT-RESIDENTIAL INCOME PROPERTY
This form may be used for appraisal of income producing properties provided the loan requested does not exceed $750,000.

| | |
|---|---|
| Borrower/Client **Endeavor Development** | File No. 06-1241 |
| Property Address **1301 16th St** | Map Reference |
| City **Auburn** | County **Nemaha** | State **NE** | Zip Code **68305-2362** | Census Tract **9982.00** |
| Legal Description **Calvert First Addition, Block 4, Lot 1** | |

Current Sale Price (if applicable) $ **350,000**    Date of Sale **9/7/08**    Loan Requested $ na
Terms of Sale **Cash at closing**
Property Rights Appraised  ☒ Fee  ☐ Leasehold (attach completed Lease Analysis FHLMC Form 461)
Lender **Endeavor Development & Investing Group, Inc.**   Lender's Address **8548 Utica Ave, #100, Rancho Cucamonga, CA 91730**
Instructions to Appraiser: The purpose of this appraisal is to estimate the current Market Value of the Subject Property. The Definition of Market Value is as set forth in Certification And Statement Of Limiting Conditions (FHLMC 439).
Note: FHLMC/FNMA do not consider the racial composition of the neighborhood to be a relevant factor and it must not be considered in the appraisal.
Other Information   **This is a complete appraisal report in summary format.**
Appraisal requested from **Wilson Appraisal Company**   Date **October 10,    2008   By Auburn State Bank**
Items 1, 2, 4, 5, 6 are required. Attach additional items and check box if items are considered appropriate for this appraisal or are requested by Lender.

| 1. ☒ Describe/lne photographs of subject property | 7. ☒ Map(s) |
|---|---|
| 2. ☒ Descriptive photographs of street scene | 8. ☐ Plot plan or survey |
| 3. ☐ Photographs of | 9. ☐ Qualifications of Appraiser |
| 4. ☐ Sketch of floor plan of typical units | 10. ☐ Lease Analysis FHLMC 461 required if leasehold interest Appraised |
| 5. ☐ Owner's current certified rent roll if existing, or pro forma if proposed or incomplete | 11. ☐ Summary of reciprocal agreements with other owners for use of parking, driveways, recreational facilities, private streets. (required if applicable) |
| 6. ☐ Owner's income and expense statement   20 ___, or pro forma income and expense statement | 12. ☐ |
| | 13. ☐ |

| | | | | OVERALL RATING | Good | Avg. | Fair | Poor |
|---|---|---|---|---|---|---|---|---|
| Location | ☒ Urban | ☐ Suburban | ☐ Rural | Employment Stability | | ☒ | | |
| Built up | ☒ Over 75% | ☐ 25% to 75% | ☐ Under 25% | Adequacy of Utilities | | ☒ | | |
| Present land use | % Condominiums | 70 % 1-Family | 10 % Apartments | Convenience of Schools | | ☒ | | |
| | 20 % Commercial | % | | Police and Fire Protection | | ☒ | | |
| Change in present land use | ☒ Not Likely | ☐ Likely (*) | ☐ Taking Place (*) | Recreational Facilities | | ☒ | | |
| | (*) From | To | | Property Compatibility | | ☒ | | |
| Property values | ☒ Increasing | ☐ Stable | ☐ Declining | Protection from Detrimental Conditions | | ☒ | | |
| Housing demand/supply | ☒ In balance | ☐ Shortage | ☐ Oversupply | General Appearance of Properties | | ☒ | | |
| Predominant occupancy | ☐ Owner | ☒ Tenant | 5 % Vacant | Appeal to Market | | ☒ | | |
| Condominium | Price range $ na | to $ | Predominant $ na | | Distance | Access or Convenience |
| | Age | yrs. to | yrs. | Predominant | yrs. | Public Transportation | na | ☒ | |
| Single Family: | Price range $ 15,000 | to $ 200,000 | Predominant $ 75,000 | Employment Centers | .1 Miles | | ☒ | |
| | Age 0 | yrs. to 120 | yrs. | Predominant 60 | yrs. | Shopping Facilities | .1 Mile | | ☒ | |
| Typical apartment: | Type Garden | No. Stories 3 | | Grammer Schools | .5 mile | | ☒ | |
| | No. Units 8 | Age 60 | yrs. | Condition Average | Freeway Access | na | | ☒ | |
| | Rent Limit: ☐ Increasing | ☒ Stable | ☐ Declining | Rent Controls ☒ No ☐ Yes (comments on page 4 if Yes) | |

Estimated neighborhood apartment vacancy rate  10 %  ☐ Decreasing ☒ Stable ☐ Increasing
Describe any incompatible land uses and overall property appeal and maintenance level **Homes and apartments within the neighborhood are reasonably well maintained. Apartments are mostly older conversions. Property uses are generally compatible.**

Describe any oversupply of units in area by type and rental **Vacancy rates are similar in all unit types.**

Describe any shortage of units in area by type and rental **No shortage exists**

Describe potential for additional units in area considering land availability, zoning, utilities, etc. **Limited potential exists since there isn't significant demand for additional units.**

Is population of relevant market area of insufficient size, diversity and financial ability to support subject property and its amenities ?   **NO**  If yes, specify.

Describe any probable changes in the economic base of neighborhood which would favorably or adversely affect apartment rentals (e.g. employment centers, zoning) **No major economic changes are foreseen**

General comments including other favorable or unfavorable elements not mentioned (e.g. public parks, view, noise, parking congestion)  **The subject neighborhood is located immediately north of the Central Business District of Auburn and only 8 miles from Peru State College. The area has been popular with tenants over the years. Off-street parking is available. Marketing time is generally under 90 days.**

| Dimensions **78 x 160** | Area **14,220**    Sq. ft. or Acres |
|---|---|
| Zoning (classification, uses and densities permitted) **Commercial** | |
| | Present Improvements ☒ do  ☐ do not conform to zoning regulations |
| Highest and best use  ☒ Present use  ☐ Other (specify) | |

| | Public | Comm. | Individual | Street | ☒ Public | ☐ Private | Ingress and Egress (Adequacy) | Average |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | ☐ | Surface Asphalt | | | Topography Level | |
| Gas | ☒ | ☐ | ☐ | ☒ Storm Sewer | | | View Amenity  Average | |
| Water | ☒ | ☐ | ☐ | ☒ Curb & Gutter | | | Drainage and Flood Conditions | |
| Sanitary Sewer | ☒ | ☐ Sep.Tnk. ☐ | ☒ Sidewalk | ☐ Alley | | | | |
| ☒ Underground Electricity & Telephone | ☒ Street Lights | | | Is the property located in a HUD Identified Special Flood Hazard Area? | |

COMMENTS (including any easements or encroachments or any nonconforming use(s) of present improvements)  **Subject is assumed to have typical utility easements. There are 5 on-site parking stalls available and limited street parking is also available.**

FHLMC Form 718-Rev. 6/77 (12K)                                                                    Page 1

Form 718 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 06-1241

October 12, 2005

File No. 06-1241

Endeavor Development & Investing Group, Inc.
8558 Utica Ave. #100
Rancho Cucamonga, CA 81730

Re: Property:   1301 19th St
                Auburn, NE 68305-2352
    Borrower:   Endeavor Development
    File No.:

In accordance with your request, we have appraised the above referenced property. The report of that appraisal is attached.

The purpose of this appraisal is to estimate the market value of the property described in this appraisal report, as improved, in unencumbered fee simple title of ownership.

This report is based on a physical analysis of the site and improvements, a locational analysis of the neighborhood and city, and an economic analysis of the market for properties such as the subject. The appraisal was developed and the report was prepared in accordance with the Uniform Standards of Professional Appraisal Practice.

The value conclusions reported are as of the effective date stated in the body of the report and contingent upon the certification and limiting conditions attached.

It has been a pleasure to assist you. Please do not hesitate to contact me or any of my staff if we can be of additional service to you.

Sincerely,

Matthew J. Wilson

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and reference to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Wilson Appraisal
form ACR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

ADDRESS OF PROPERTY APPRAISED: __1301 19th St, Auburn, NE 68305-2362__

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: | Signature: |
| Name: __Matthew J. Wilson__ | Name: |
| Date Signed: __October 12, 2006__ | Date Signed: |
| State Certification #: __CG-920193__ | State Certification #: |
| or State License #: | or State License #: |
| State: __NE__ | State: |
| Expiration Date of Certification or License: __12/31/2008__ | Expiration Date of Certification or License: |

☐ Did   ☐ Did Not Inspect Property

Form ACR — 'WinTOTAL' appraisal software by a la mode, inc. — 1-800-ALAMODE

Nov. 16. 2010  4:23PM   ALLAN J EUREK PC 402-477-7525          No. 2278   P. 59

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Gross Income | $55,030.00 | $57,834.00 | $60,725.70 | $63,761.99 | $66,950.08 |
| Other Income | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Gross Income | $55,030.00 | $57,834.00 | $60,725.70 | $63,761.99 | $66,950.08 |
| Vacancy Allowance | $(5,508.00) | $(5,783.40) | $(6,072.57) | $(6,376.20) | $(6,695.01) |
| Gross Operating Income | $49,522.00 | $52,050.60 | $54,653.13 | $57,385.79 | $60,255.08 |
| Operating Expenses | $(7,728.00) | $(7,982.56) | $(8,040.21) | $(8,201.02) | $(8,365.04) |
| Net Operating Income | $41,844.00 | $44,168.04 | $46,612.92 | $49,184.77 | $51,890.04 |
| Debt Service | $(11,520.00) | $(11,520.00) | $(11,520.00) | $(11,520.00) | $(11,520.00) |
| Cash Flow Before Taxes | $30,324.00 | $32,648.04 | $35,092.92 | $37,664.77 | $40,370.04 |
| Capitalization Rate | 28.66% | 30.46% | 32.15% | 33.02% | 35.79% |
| Cash On Cash Return | 209.13% | 225.16% | 242.02% | 259.76% | 278.41% |
| Tax Liability | $(7,309.63) | $(7,960.36) | $(8,644.93) | $(9,365.05) | $(10,122.52) |
| Cash Flow After Taxes | $23,014.37 | $24,687.68 | $26,447.99 | $28,299.73 | $30,247.52 |
| Cumulative CFAT | $23,014.37 | $47,702.05 | $74,150.04 | $102,449.77 | $132,697.29 |
| Net Operating Income | $41,844.00 | $44,168.04 | $46,612.92 | $49,184.77 | $51,890.04 |
| Total Loan Interest | $(11,520.00) | $(11,520.00) | $(11,520.00) | $(11,520.00) | $(11,520.00) |
| Depreciation | $(4,218.18) | $(4,218.18) | $(4,218.18) | $(4,218.18) | $(4,218.18) |
| Taxable Income/Loss | $26,105.82 | $28,429.86 | $30,874.74 | $33,446.59 | $36,151.86 |
| Marginal Tax Bracket | 28.00% | 28.00% | 28.00% | 28.00% | 28.00% |
| Tax Liability | $7,309.63 | $7,960.36 | $8,644.93 | $9,365.05 | $10,122.52 |

Nov. 16. 2010  4:23PM   ALLAN J EUREK PC 402-477-7525          No. 2276   P. 60

File No. 09-1241

**Summary Appraisal Report**                Vaicne Appraisal
## APPRAISAL REPORT-RESIDENTIAL INCOME PROPERTY
This form may be used for appraisal of income producing properties provided the loan requested does not exceed $750,000.

| | |
|---|---|
| Borrower/Client: Endeavor Development | File No. 09-1241 |
| Property Address 1301 19th St | Map Reference |
| City Auburn  County Nemaha  State NE  Zip Code 68305-2362  Census Tract 9982.00 | |
| Legal Description  Calvert First Addition, Block 4, Lot 1 | |

Current Sale Price (if applicable) $ 350,000    Date of Sale 9/7/09    Loan Requested $pre

Terms of Sale  Cash at closing

Property Rights Appraised  ☒ Fee  ☐ Leasehold

Lender Endeavor Development, & Investing Group, Inc.   Lender's Address 8596 Utica Ave, #100, Rancho Cucamonga, CA 91730

Dimensions  78 x 180                      Area 14,220   Sq. Ft. or Acres
Zoning (classification, zones and densities permitted) Commercial

Highest and best use  ☒ Present use  ☐ Other (specify)

Nov. 16. 2010  4:23PM    ALLAN J EUREK PC 402-477-7525          No. 2278   P. 61

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 1901 19th St | 1107 Central Ave | 806 No. 12th | 1300 N Street |
| | Auburn | Auburn | Nebraska City | Auburn |
| Proximity to subject | | 0.62 miles N | 20.42 miles N | 0.44 miles N |
| Map info | | | | |
| Lot size | 14,220 | 128.5 x 141 | 96 x 120 | Similar |
| Brief description of building | No. Units: 18  No. Vac. 2 | No. Units: 9  No. Vac. 0 | No. Units: 8  No. Vac. 0 | No. Units: 8  No. Vac. 0 |
| | Year Built 19 00 | Year Built 19 20 | Year Built 19 68 | Year Built 19 00 |
| Improvements | 3 Story - walk-up | 2 Story walk-up | 2 Story walk-up | 3 Story Walk-up |
| | | 2 buildings | 2 buildings | Conversion |
| Quality | Average | Average | Average | Average |
| Condition | Average | Average | Average | Fair |
| Recreational facilities | None | None | None | None |
| Parking | 6 stalls off street | 10 stalls off street | Off Street | Off Street |
| Tenant appeal | Average | Average | Average | Average |
| Building | 5696 Sq Ft | 6808 Sq Ft | 6360 Sq Ft | 2968 Sq Ft |

3103 sf

< 25 %
decline
3 from now

| | No. of Units | UNIT ROOM COUNT | | | No. of Units | UNIT ROOM COUNT | | | No. of Units | UNIT ROOM COUNT | | | No. of Units | UNIT ROOM COUNT | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | BR | Bath | | Total | BR | Bath | | Total | BR | Bath | | Total | BR | Bath |
| Unit breakdown | 1 | 4 | 2 | 1 | 8 | 4 | 2 | 1 | 8 | 4 | 2 | 1 | 5 | 3 | 1 | 1 |
| | 15 | 3 | 1 | 1 | | | | | | | | | 1 | 2 | 1 | |

| Util. paid by owner | Water/Sewer | Water/Sewer | Water/Sewer | Water/Sewer |
| Data source | Inspection/Owner | Inspection/Owner | County Records | Rental Files |
| Price | $ 1,350,000 | Unit | $ 150,000 | Unit | F | $ 285,000 | Unit | F | $ 71,000 | Unit | F |
| Sale-Listing-Offer | NA | NA | Sale | Sale |
| Date of sale | 9/??/06 | 05/06 | 02/06 | 04/06 |
| | NA | Conv. | Conv. | Conv. |

$S/rev   10

| Terms (including conditions of sale and financing terms) | | | | |

Complete as many of the following items as possible using data effective at time of sale

| Gross Annual Income | $ 72,900 | $ 44,490 | $ 48,000 | $ 21,710 |
| Gross Ann. Inc. Mult. (1) | 4.82 | 3.30 | 5.94 | 3.27 |
| Net Annual Income | 48,235 | 29,835 | 29,374 | 11,512 |
| Expense Percentage (2) | 35.32 % | 16.32 % | 38.80 % | 47.00 % |
| Overall Exp. Ratio (3) | | 15.88 % | 10.31 % | 16.21 % |
| Price per unit | $ | $ 19,750 | $ 35,625 | $ 11,833 |
| Price per room | $ | $ 78,000 | $ | $ |
| Price per sq. Bldg. area | $ /sq. ft. Bldg. area | $ /sq. ft. Bldg. area | $ /sq. ft. Bldg. area | $ /sq. ft. Bldg. area |

(1) Sale Price / Gross Annual Income  (2) Total Annual Expenses / Total Gross Annual Income  (3) Net Annual Income / Price

RECONCILIATION: Comps 1 & 3 are very recent sales in Auburn and comps 2 & 4 are recent sales in nearby Nebraska City. This is considered a very similar rental market and would compare for the same rental market and the same investors. Rents and expenses are similar for all the comparables and the subject. The indicated GRM is in the range of 3.27 to 5.94 and the subject is near the middle of this range. Most probable GRM is 4.8 which results in a value estimate of $349,480.

INDICATED VALUE BY MARKET APPROACH 348,500

33,275

132

37,815
13.6
760
540W
1097

| INCOME | | EXPENSE | ACTUAL | FORECASTED |
|---|---|---|---|---|
| Total Monthly Apartment Forecasted Rents | $ 6,050 | Real Estate Taxes | $ 856 | $ 650 |
| Other Monthly Income (itemize) | $ | Other taxes or licenses | | |
| | $ | Insurance | 1,200 | 1,200 |
| Total Gross Monthly Forecasted Income | $ 6,050 | Heating-fuel and mtl | | |
| Total Gross Annual Forecasted Income | $ 72,600 | Fuel | | |
| Less Forecasted Vacancy and Collection Loss ( 10 %) | $ 7,260 | Gas | 4,800 | 6,000 |
| Effective Gross Annual Income | $ 65,340 | Electricity | | |
| Less Forecasted Expenses & Replacement Reserves | $ 19,105 | Water and sewer | | |
| Net Annual Income from Total Property | $ 46,235 | Trash removal | | |
| Less Return on and Recapture of Depreciated Value of ... | | Pest control | 200 | 200 |
| Furnishings ($ @ %) | $ | Maintenance and repairs | 3,264 | 3,300 |
| Net Annual Income from Real Property | $ 46,235 | Interior and exterior decorating | | 200 |
| Capitalized as follows: | | Cleaning expense and supplies | 200 | 4,555 |
| $46,235/.132 = $350,265 | | Management (Off site) | 0 | |
| | | Res. Mgr., salary & apartment | | |
| Called | $350,000 | Janitor(s) salary & apartment | | |
| | | Miscellaneous | 300 | 300 |

29,495
.132

$220,000

| *Real Est. Taxes ☒ Actual ☐ Est. Tax Rate Per $100  $ 2.08558 | | |
| Total Assessed Value $ 45,310 | REPLACEMENT RESERVES | | |
| Comments: There is a long rental and expense history and the | Carpeting and drapes | | |
| data is considered strong. The market supports the | Ranges and refrigerators | | |
| estimated market rents. | Dishwashers and disposals | | |
| | Individual heating & AC units | | |
| | 150 per unit | 0 | 2,400 |
| | TOTAL EXPENSES & REPL. RES. | $ 10,080 | $ 19,105 |

INDICATED VALUE BY INCOME APPROACH $350,000

FHLMC FORM 71B - Rev. 8/77                Form 71B - "Mini TOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE          Page 3

Nov. 16. 2010  4:24PM    ALLAN J EUREK PC 402-477-7525              No. 2278   P. 62

File No. 08-1241

| | **Supplemental Addendum** | | File No. 08-1241 | |
|---|---|---|---|---|
| Borrower/Client | Endeavor Development | | | |
| Property Address | 1301 16th St | | | |
| City | Auburn | County Nemaha | State NE | Zip Code 68305-2352 |
| Lender | Endeavor Development & Investing Group, Inc. | | | |

FINAL RECONCILIATION:

The cost approach lacks credibility in this report due to the lack of apartment land sales and the difficulty in estimating accrued depreciation from all sources. The subject is a 77 year old apartment complex and does not lend itself to a good analysis of value through the cost approach.

The income approach analyzes the goals of an investor. These goals in income producing property are twofold. One, a return on the investment, and two, an expected return of the investment. The return of the investment depends on the net operating income for the property and the return of investment is realized on resale. Significant market rental and expense information was available for analysis in this approach and the value estimate is felt to be quite accurate. The major weight is given to this approach.

The sales comparison approach is usually a strong indicator of value, especially when sufficient comparable data are found. In this appraisal the appraiser analyzed the three available sales and this approach provides very good support to the income approach.

The market approach and income approaches lend valuable support to each other and both derived the same value estimate. Therefore, the market value of the subject property as of August 8, 2008 is estimated at $340,000.

This is a summary report of a complete appraisal.

SCOPE OF WORK: Analysis of subject property was based on interior and exterior inspection, information gathered from county records, viewing the neighborhood, data from applicable maps. Comparable properties were based on MLS data, county records and exterior viewing. Sales comparison and Cost approach was were developed. Income approach was not applicable due to lack of adequate data.

CLIENT AND INTENDED USE OF APPRAISAL: This report is intended for use only in the analysis of real estate loan collateral for mortgage lending purposes. This report is not intended for any other use. This report is intended for use only by Endeavor Development & Investing Group for federally related mortgage loan purposes.

HIGHEST AND BEST USE: The current use of the subject property and the use of the subject property reflected in the appraisal is that of a residential multi-family dwelling. This residential multi-family use is the highest and best use of the real estate as of the date of the appraisal. This use is legally permissible, physically possible, financially feasible and maximally profitable.

Nov. 16. 2010  4:24PM    ALLAN J EUREK PC 402-477-7525          No. 2278   P. 63

## RESIDENTIAL INCOME PROPERTY
### MARKET DATA ANALYSIS

File No. 09-1741

| ITEM | SUBJECT | COMPARABLE NO. 4 | COMPARABLE NO. 5 | COMPARABLE NO. 6 |
|---|---|---|---|---|
| Address | 1301 19th St Auburn | 1715 4th Corso Nebraska City 19.83 miles N | | |
| Proximity to subject | | | | |
| Map code | | | | |
| Lot size | 14,220 | 128.5 x 144 | | |
| Brief description of building improvements | No. Units 16  No. Vac 2<br>Year Built 00<br>3 Story - walk-up | No. Units 8  No. Vac 0<br>Year Built 49<br>2 Story walkup | No. Units ___  No. Vac ___<br>Year Built ___ | No. Units ___  No. Vac ___<br>Year Built ___ |
| Quality | Average | Average | | |
| Condition | Average | Average | | |
| Recreational facilities | None | None | | |
| Parking | 8 stalls off street | Off Street | | |
| Tenant appeal | Average | Average | | |
| Building | 5895 Sq Ft | 5378 Sq Ft | | |

| | No. of Units | UNIT ROOM COUNT | | | No. of Units | UNIT ROOM COUNT | | | No. of Units | UNIT ROOM COUNT | | | No. of Units | UNIT ROOM COUNT | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | BR | Bath | | Total | BR | Bath | | Total | BR | Bath | | Total | BR | Bath |
| Unit breakdown | 1<br>15 | 4<br>3 | 2<br>1 | 1<br>1 | 8 | 4 | 2 | 1 | | | | | | | | |

| | SUBJECT | COMPARABLE NO. 4 | COMPARABLE NO. 5 | COMPARABLE NO. 6 |
|---|---|---|---|---|
| Util. paid by owner | Water/Sewer | | | |
| Data source | Inspection/Owner | County Records | | |
| Price | $ $350,000  ☐ Unf. ☒ F | $ 245,000  ☐ Unf. ☐ F | $ ☐ Unf. ☐ F | $ ☐ Unf. ☐ F |
| Sale-Listing-Offer | NA | Sale | | |
| Date of sale | 9/7/05 | 04/06 | | |
| Terms (including conditions of sale and financing terms) | NA | | | |

Complete as many of the following items as possible using data effective at time of sale

| | | | | |
|---|---|---|---|---|
| Gross Annual Income | $      72,000 | $      44,400 | $ | $ |
| Gross Ann. Inc. Mult. (1) | 4.83 | 5.52 | | |
| Net Annual Income | $      46,333 | $      25,055 | $ | $ |
| Expense Percentage (2) | 36.32 % | 43.61 % | % | % |
| Overall Cap. Rate (3) | % | 10.22 % | % | % |
| Price per SF/R | $ | $      30,625 | $ | $ |
| Price per room | $ | $ | $ | $ |
| Price gross bldg. area | $      /sq. ft. bldg. area | $      /sq. ft. bldg. area | $      /sq. ft. bldg. area | $      /sq. ft. bldg. area |

Comments:

Nov. 16. 2010 4:24PM    ALLAN J EUREK PC 402-477-7525          No. 2278   P. 64

<span>(File No. 06-1781)</span>

GENERAL COMMENTS (including comments on any items rated poor or fair) The subject appears structurally/sound and appears to have been periodically updated and maintained. With on going maintenance and updating the property should maintain it's rentability and marketability.

CONDITIONS AND REQUIREMENTS OF APPRAISAL (include required repairs, replacements, painting, termite inspections, etc.)

## RECONCILIATION AND VALUE CONCLUSION

Indicated Value by the Cost Approach ..................... $ ___351,423___

Indicated Value by the Market Approach ................... $ ___348,500___

Indicated Value by the Income Approach ................... $ ___350,000___

FINAL RECONCILIATION    The major weight is given to the Income Approach as it is the way that investors look at income producing property like the subject. However, the other approaches in value provide good support for the Income Approach. See attached Addendum.

I certify, that to the best of my knowledge and belief, the statements made in this report are true and I have not knowingly withheld any significant information that I have personally inspected subject property, both inside and outside, and have made an exterior inspection of all comparable sales listed herein; that I have no interest, present or contemplated, in subject property or the participants in the sale; that neither the employment nor compensation to make said appraisal is contingent upon any value estimate; and, that all contingent and limiting conditions are stated herein.       ☒ Certification and Statement of Limiting Conditions

FHLMC Form 439 Rev. 6/93) applies       ( ☐ are file with Client   ☒ Attached).

As a result of my investigation and analysis, my estimate of Market Value of the subject property as of _____October 10_____ 19 06 is ...............

$ 350,000

Date October 12, 2006            Appraiser _____   Matthew J. Wilson
                                 If applicable, complete the following

Date _____            Appraiser _____

Date _____            ☐ Supervising or  ☐ Review Appraiser _____
                                              ☐ Did  ☐ Did Not Physically Inspect Property

## FOR LENDER'S USE ONLY (completion optional)

Loan Recommended $ _____ @ _____ %.  Term _____ yrs.  Principal & Interest $ _____ /mo. $ _____ /annually
Subject to: _____

| Borrower's Cost or Purchase Price | $ _____ | Appraised Value $ _____ | | Loan to Appraised Value _____ % |
| Loan: Per Unit $ _____ | Per Room $ _____ | For Sq. Ft. of Building Area $ _____ | |
| Gross Annual Forecasted Income | $ _____ | Gross Annual Income Multiplier _____ | Overall Capitalization Rate _____ % |
| Forecast Net Annual Expenses and Replacement Reserve | $ _____ | ( _____ % of Gross Annual Forecasted Income) | |
| Break-even Point (No loan): (Annual Exp. & RR  $ _____ | + Annual P & I pymts. $ _____ ) / (Gross Annual Income $ _____ ) | | = _____ % |
| (All financing) : (Annual Exp & RR  $ _____ | + Annual P & I pymts. for all financing $ _____ ) / (Gross Annual Income $ _____ ) | | = _____ % |
| Borrower's Return on Appraised Equity | (Net Annual Inc.  $ _____ | (-) Annual P & I pymts $ _____ ) = $ _____ | (1) |
| | (Appraised Value  $ _____ | (-) Loan Amt. $ _____ ) = $ _____ | (2) |
| | | $ _____ (1)/$ _____ ) = $ _____ | (2) = _____ % |

Comments or Corrective Action _____

FHLMC FORM 71B - REV. 8/77                                                            Page 4

Form 71B — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Nov. 16. 2010  4:24PM   ALLAN J EUREK PC 402-477-7525     No. 2278   P. 65

| OVERALL PROPERTY RATING | Good | Avg | Fair | Poor |
|---|---|---|---|---|
| General appearance of property | | X | | |
| Quality of construction (materials and finish) | | X | | |
| Condition of improvements | | X | | |
| Rooms size and layout | | X | | |
| Closets and storage | | X | | |
| Plumbing–adequacy and condition | | X | | |
| Electrical–adequacy and condition | | X | | |
| Amenities and parking facilities | | X | | |
| Appeal to market | | X | | |

**LAND**

| | Zoning | Area | Sales Price | Date | Price per Sq. Ft. or per Unit |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |

Estimated Land Value ............... $ 40,000

**APARTMENT BUILDING(S)–ESTIMATED REPRODUCTION COST NEW**

| | | Sq. Ft. X | (Stories) = | Sq. Ft. X | $ | $ |
|---|---|---|---|---|---|---|
| X | = | 4,037 Sq. Ft. X | 1 (Stories) = | | 53.93 | 217,715 |
| X | = | 7,022 Sq. Ft. X | 2 (Stories) = | | 53.93 | 378,688 |
| X | = | 714 Sq. Ft. X | 1 (Stories) = | | 25.82 | 18,435 |
| OTHER IMPROVEMENTS  Appliances | | | | | | 8,000 |

TOTAL ESTIMATED COST NEW OF IMPROVEMENTS ............... $ 311,423

**LESS DEPRECIATION**  Eff. Age 35  REM 35

| DEPRECIATED VALUE OF IMPROVEMENTS | $ 311,423 |
|---|---|
| ADD ESTIMATED LAND VALUE | $ 40,000 |
| INDICATED VALUE BY THE COST APPROACH (IN FEE SIMPLE) | $ 351,423 |
| LESS/HOLD DEDUCT VALUE OF FEE INTEREST (ATTACH CALCULATIONS) | $ 0 |
| INDICATED VALUE BY THE COST APPROACH (LEASEHOLD) | $ 351,423 |

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Address | 1400 K Street Auburn | 26th & L Auburn | 2513 L Street Auburn |
| Proximity to subject | 0.4 miles NE | 0.18 miles NE | 0.44 miles SE |
| Date sale/sold | 04/05 | 04/05 | 05/05 |
| Total | No Units 12  No. Vacant 0  Age 78 Yrs | No. Units 4  No. Vacant 0  Age 41 Yrs | No. Units 4  No. Vacant 0  Age 41 Yrs |
| Design/description of property | Two Story Average Quality Average Condition | Two Story Average Quality Average Condition | Two Story Average Quality Average Condition |

Page 2

Form 71B — WinTOTAL® appraisal software by a la mode, inc. — 1-800-ALAMODE

Nov. 16. 2010, 4:24PM    ALLAN J EUREK PC 402-477-7525          No. 2278   P. 66
                                              BERNARD REAL ESTATE         PAGE  01



## MANAGEMENT AGREEMENT

We, _____, are the current legal owners of
record for the following legally described property:

Or more commonly known as:

employ David and Rachel Rieger in Auburn Nebraska as Independent Management Contractors to manage the
above mentioned property.

The management agent will be entitled to ten percent (10%) of all monthly rent collections.  In consideration for
this fee management will

    1   Qualify all prospective tenants
    2   Verify all tenant information
    3   Collect monthly rent
    4   Collect security deposit
    5   Pay monthly bills with rent proceeds belonging to owners
    6   Hire contractors to perform work properly paid with rent proceeds

Current owners grant David and Rachel Rieger, in the normal course of business, authority to authorize repairs not
to exceed $350.00 without consenting the owners.  Any amount for repairs above the stated amount must be
verified with the owner.

Owners will hold David and Rachel Rieger and all their agents harmless for any and all damage done to the above
mentioned property by previous, current and future tenants that was not paid by said tenant.

David and Rachel Rieger will not release any of the security deposit in part or full without consent of the owners.

The owners of the above-mentioned property authorize David and Rachel Rieger to negotiate rent between
$_____ and $_____.

Either party may terminate this agreement at any time.

_____
OWNER

                              _____
                                David and Rachel Rieger, Management Agent

_____
OWNER

Nov. 16. 2010  4:24PM    ALLAN J EUREK PC 402-477-7525

No. 2278   P. 67



**EXHIBIT**

D

## STATE OF NEBRASKA – STATE FIRE MARSHAL
246 South 14th Street
Lincoln, NE 68508-1804

# ORDER FORM

V-010106

ORDER NUMBER....................
DATE OF INSPECTION............. 10/21/2008
OWNER................................ Endeavor Development & Investments Group Inc.
OCCUPANT.......................... Avenue Apartments
ADDRESS............................. 1301 19th Street
CITY/TOWN........................ Auburn, NE  68305
COUNTY............................. Nemaha
HOW OCCUPIED.................... 16 unit apartment bldg

FEE CARD   YES ☐   NO ☒          REVISIT DATE

## ORDER

This facility was inspected for fire and life safety at the request of the management company (Rieger Investment Properties) with the following items found that shall be corrected:

1. The fire alarm panel was found in "Trouble" mode at the time of inspection. The panel could not be opened to check on the last fire alarm inspection. A fire alarm company shall be contacted immediately to put the panel in normal conditon. The fire alarm system shall be inspected at least every 6 months by a Nebraska licensed fire alarm inspector. NFPA 101 4.6.12.1, 1 10.4.1, 101 4.6.12.3, 1 10.4.4, 101 31.3.4, SS 28-1251.

2. Of the nine apartments that were inspected only 1 had an operating smoke detector (all smoke detectors were powered by the house electrical system). All of the smoke detectors shall be replaced with listed AC powered smoke detectors. Battery operated detectors shall be installed immediately for occupant protection until the AC powered detectors can be replaced. NFPA 101 4.6.12.1, 1 10.4.1, 101 31.3.4.5.

3. None of the emergency light units worked, these shall be repaired to function properly. The emergency lighting is required to be tested at least every 30 days with documentation kept of the testing. NFPA 101 4.6.12.1, 1 10.4.1, 101 7.9.3.

4. Numeorus electrical outlets, junction boxes and light switches were found without approved covers on them throughout the building. All outlets, junction boxes and light switches shall have approved covers placed on them. NFPA 70 314.25.

5. The light fixture directly above the fire alarm panel had an electrical wire junction not in a junction box. All electrical splices shall be made in an approved junction box. NFPA 70 300.15.

6. The lower level laundry room, mechanical room and storage areas and any other room located in the remainder of the building used for storage or a janitors closet shall be separated from the remainder of the building by construction having at least a one hour rating with any openings protected by approved self closing fire doors and frames having at least a 45 minute fire rating. NFPA 101 31.3.2.1.

7. The lower level shall be separated from the first floor at the stairwell by construction having at least a one hour rating with the opening protected by an approved self-closing fire door and frame having at least 60 minute fire resistive rating. NFPA 101 31.3.1, 31.3.1.2.

8. The open stairwell connecting the 1st, 2nd and 3rd floors shall be enclosed by construction having a one hour fire resisitive rating and any openings protected by approved self-closing fire doors and frames having at least a 60 minute fire rating. This rated enclosure shall be continued on the first floor to the outside. NFPA 101 31.3.1, 31.2.2.3, 7.2.2.5.

9. All penetrations of the floors by utility equipment (pipes, electrical wiring) shall be enclosed or sealed

## STATE OF NEBRASKA – STATE FIRE MARSHAL
246 South 14th Street
Lincoln, NE 68508-1804

# **ORDER FORM**                    V-010106

at the ceiling/floor assembly to prevent smoke and fire passing between the floors. NFPA 101.31.3.1.1, 8.2.5.

10. The extension cord for the window air conditioner in apartment 17 and for the refrigerator in apartment 5 shall be removed and approved outlets installed if needed. NFPA 70 400-8, 1 11.1.5.

11. All apartment doors that enter into a corridor shall have not less than a 20 minute fire resistive rating. NFPA 101 31.3.6.2.

12. All apartment doors that enter into a corridor shall be self-closing and postive latching. NFPA 101 31.3.6.3.

13. Transoms, louvers, or transfer grills sahll be prohibited in walls or doors of exit access corridors. NFPA 101 31.3.6.5.

14. Documentation shall be provided that the ceiling tile in the exit corridors meets a Class A or B rating and the ceiling tile in the apartments meet a Class A, B or C interior finish or the tile shall be removed or covered with a material that will meet the required rating. NFPA 101 31.3.3.2.

15. A second approved means of egress shall be provided from each apartment on the second and third floors unless the following is met: The current stairway is separated from the rest of the building by barriers having not less than a 1-hour fire resistance rating, with self-closing doors having not less than a 1-hour fire protection rating protecting all openings between the stairway enclosure and the building; all corridors serving as access to exits have not less than a 20-minute fire resistance rating; The travel distance from the entrance door of any dwelling unit to an exit does not exceed 35 ft.; Horizontal and vertical separation with a fire rating of not less than 1/2 hour is provided between dwelling units. NFPA 101 31.2.4(exception #3). The second exit will not be allowed through another dwelling unit for the second and third floor.

16. The current fire sprinkler system shall be inspected by a Nebraska licensed fire sprinkler company at least annually and any deficiencies found corrected. NFPA 101 4.6.12.3, 1 10.4.4.

Items 1, 2, 3 & 16 shall be corrected prior to renting any more apartments.

A written plan of correction for the remainder of the items shall be provided to this office on or before November 24, 2008.

If you have questions on this Order, contact the District A State Fire Marshal Office at 402.471.2590. Or mail at: State Fire Marshal Office, District A Office , 246 South 14th Street , Lincoln, NE , 68508-1804

*All items must be corrected to comply with the laws of the State of Nebraska and with rules and regulations adopted by the Nebraska State Fire Marshal as mandated by Sections 81-502 to 81-541.01*

*It is the duty of the owner or person in charge of the above-named facility or location to immediately take measures to bring the facility into compliance with state regulations.*

## ALL CORRECTIONS SHALL BE MADE AND
## ALL ITEMS CORRECTED ON OR BEFORE:

Any damage proximately caused by a failure to remedy the above listed deficiencies shall be deemed to be the sole responsibility of the owner or person in charge by virtue of this notification and order.

Nov. 16, 2010  4:25PM   ALLAN J EUREK PC 402-477-7525        No. 2278   P. 69

# STATE OF NEBRASKA – STATE FIRE MARSHAL
246 South 14th Street
Lincoln, NE 68508-1804

# ORDER FORM                              V-010106

Witness my electronically typed name at Syracuse, Nebraska, this day of October 23, 2008.

By:   **Bruce Neemann, 8704**            Phone Number: 402-269-5921
       DEPUTY STATE FIRE MARSHAL.

Image ID:

**SUMMONS**

Doc. No.    4760

IN THE DISTRICT COURT OF Nemaha COUNTY, NEBRASKA
Nemaha County Courthouse
1824 N Street
Auburn          NE 68305 2343

SJT Development, Inc., a Nevada Cor v. Rachel L Rieger

Case ID: CI 10    106

TO:  Bernard,John,L d/b/a Bernard Re

You have been sued by the following plaintiff(s):

    SJT Development, Inc., a Nevada Cor

Plaintiff's Attorney:
Address:

Allan J. Eurek
3901 Normal Boulevard, Suite 203
Lincoln, NE 68506-5250

Telephone:          (402) 477-7500

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Date:  APRIL 21, 2011        BY THE COURT:          _Amy Hecker_
                                                      Clerk

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

        Bernard,John,L d/b/a Bernard Re
        115 S. 54th Street
        Omaha, NE 68132-3401

Method of service:  Certified Mail

You are directed to make such service within twenty days after date of issue,
and show proof of service as provided by law.

**SENDER: COMPLETE THIS SECTION**

Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
Print your name and address on the reverse
so that we can return the card to you.
Attach this card to the back of the mailpiece,
or on the front if space permits.

Article Addressed to:

John L. Bernard
115 S. 54th Street
Omaha, NE 68132-3401

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
4/25/11

_John Bernard_

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

Article Number
(Transfer from service label)   7003 2260 0007 6424 1213

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

Doc. No.   4760

...eger

... I hereby certify that on

...erved copies of the Summons

as required by Nebraska state law.

Service and return   $ _____

Copy   _____

Mileage _____ miles   _____

   TOTAL   $ _____

Date: _____   BY: _____
   (Sheriff or

**CERTIFIED M...**
**PROOF OF SERVICE**

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _John L. Bernard_

At the following address: _115 S. 54th Street_
_Omaha, NE 68132-3401_

on the _22nd_ day of _April_ _2011_, as required by Nebraska state law.

Postage $ _8.43_   Attorney for: _Plaintiffs_

The return receipt for mailing to the party was signed on _April 25_, _2011_.

To: Bernard, John, L d/b/a Bernard Re
   115 S. 54th Street

   Omaha, NE 68132-3401

**Postal Service**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ 3.28 |
| Certified Fee | 2.85 |
| Return Receipt Fee (Endorsement Required) | 2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ 8.43 |

LINCOLN NE COLLEGE VIEW
Postmark Here
2011 APR 22
USPS 4/22/2011
68506

Sent To _John L. Bernard_
Street, Apt. No.;
or PO Box No. _115 S. 54th Street_
City, State, ZIP+4 _Omaha, NE 68132-3401_

PS Form 3800, June 2002   See Reverse for Instructions

From:

Allan J. Eurek
3901 Normal Boulevard, Suite 203
Lincoln, NE 68506-5250



ATTA... & RETURN TO COURT

000003695D44

55